ENRIQUE VELÁZQUEZ TORRES, demandante y apelante, *v.* JUANA VELÁZQUEZ MORALES, demandada y apelada.

Número 11753.
*Sometido:* 14 de abril de 1961. *Resuelto:* 16 de mayo de 1961.

·620

*Práxedes Álvarez Leandri,* abogado del apelante; *Carlos E. Colón,* abogado de la apelada.

EL JUEZ ASOCIADO SEÑOR BLANCO LUGO emitió la opinión del Tribunal.

Don Marcos Velázquez Santiago, también conocido por Marcos Ramos, falleció en Ponce el día 30 de marzo de 1950. Por sentencia del anterior Tribunal de Distrito de dicha ciudad fueron declarados como sus únicos y universales herederos su viuda doña Isabel Sabater y dos hijas naturales reconocidas nombradas Juana Velázquez Morales y Rosa María Velázquez Caquías. Después de haber satisfecho la contribución sobre herencia, las personas mencionadas procedieron a la liquidación y división del caudal hereditario, otorgándose la escritura pública correspondiente. A las hermanas Velázquez se le adjudicaron en pago de sus participaciones cuatro solares sin edificaciones.

En 1 de marzo de 1951, las mencionadas hermanas Velázquez y el demandante Enrique Velázquez Torres otorgaron

una escritura pública que denominaron de compraventa y división material de bienes, mediante la cual (*a*) se le "vendió" al demandante un condominio de una mitad en dos de los solares sitos en la barriada Clausells y la Calle Vives de Ponce, por el precio total de $1,625 que las vendedoras confesaron haber recibido con anterioridad al otorgamiento; y, (*b*) se dividió la comunidad existente entre la demandada y su hermana Rosa María. A esta última se le adjudicó el condominio restante de una mitad en el solar y casa de la Calle Vives. Posteriormente, Rosa María vendió este condominio al demandante, quien en tal virtud vino a ser propietario único del referido solar.[1] La escritura mencionada fue aclarada en la misma fecha mediante un documento privado suscrito por los tres hermanos Velázquez.[2]

[1] Dicho solar, que el causante Marcos Velázquez había adquirido por compra en 28 de marzo de 1910, se describe registralmente como sigue:

"Solar radicado en el barrio Segundo, calle de Vives, de esta ciudad de Ponce, que mide diez metros cuatrocientos cuarenta y nueve milímetros, de frente por cuarenta y un metros setecientos noventa y cinco milímetros de fondo, que forman un área superficial de cuatrocientos treinta y seis metros cuadrados con setecientos once milímetros; y colinda por el *Norte con Sucesión de Abelardo Otero, antes, hoy Marcos Velázquez Santiago*, por el Sur con la Calle Vives, por el Este *María Antonia Arroyo*, antes, hoy Marcos Velázquez Santiago, y por el Oeste, Águedo Márquez, antes, hoy Marcos Velázquez Santiago. Inscrito al Tomo 577 de Ponce, folio 90 vuelto, finca número 4303 cuadruplicado, inscripción décima."

[2] El documento privado lee como sigue:

"Nosotros, Juana Velázquez Morales, Rosa María Velázquez Caquías y Enrique Velázquez Torres, conocido por Enrique Ramos Torres, reunidos en esta ciudad de Ponce, en el día primero de marzo de mil novecientos cincuenta y uno, por la presente hacemos constar:

"Que *como herederos* de don Marcos Velázquez Santiago, conocido por Marcos Ramos, *nos hemos dividido los bienes que nos correspondieron a su muerte, en la forma que aparece en la escritura pública que hemos otorgado en el día de hoy* . . .; que aunque allí aparece que ningún heredero queda a adeudar a otro, lo cierto es que como resultado del valor de los bienes divididos doña Rosa María Velázquez Caquías y don Enrique Velázquez Torres, *conocido por Enrique Ramos Torres*, quedamos a adeudar a doña Juana Velázquez Morales la suma de setecientos catorce dólares con ochenta y cuatro centavos ($714.84), pues habiéndose valorado la participación de cada heredero en tres mil doscientos noventa y seis dólares con diez y nueve centavos ($3,296.19) y habiéndosele adjudicado a ella, Juana Velázquez Morales, bienes únicamente por el valor

Según este documento, Rosa María y Enrique quedaron adeudando a Juana la suma de $714.84 cada uno, que posteriormente le pagaron. Esta cantidad representaba la diferencia entre las adjudicaciones del caudal hereditario.

La prueba demuestra que el demandante era un hijo ilegítimo del causante, a quien la viuda se negó a reconocer mediante el otorgamiento de una escritura que se preparó para ese propósito. Sin embargo, sus dos hermanas convinieron en reconocerle y adjudicarle una porción de los bienes equivalente a la que le hubiese correspondido como heredero de haber sido firmada dicha escritura.(³)

de dos mil quinientos ochenta y un dólares con veinticinco centavos ($2,581.25) resulta una diferencia en valor de setecientos catorce dólares con ochenta y cuatro centavos ($714.84) que *se nos ha adjudicado de más en las operaciones que se han realizado mediante la escritura pública otorgada en el día de hoy,* antes relacionada, y por la presente nos comprometemos doña Rosa María Velázquez Caquías y don Enrique Velázquez Torres, conocido por Enrique Ramos Torres, a pagar a doña Juana Velázquez Morales dicha suma de setecientos catorce dólares con ochenta y cuatro centavos tan pronto como vendamos las dos propiedades urbanas que se nos *han adjudicado* por dicha escritura.

"Por la presente hacemos constar que hemos convenido donar al señor Marcos Antonio Rivera la suma de trescientos dólares ($300) y al señor Esteban Font, conocido por Ñeñe, la cantidad de trescientos dólares ($300) y que esa suma la haremos efectiva tan pronto como se vendan las propiedades de la herencia.

"Y para que todo ello conste en forma auténtica se firma el presente documente por triplicado, en esta ciudad de Ponce, hoy día primero de marzo de mil novecientos cincuenta y uno.

"(Fdo.) Rosa María Velázquez (Fdo.) Enrique Velázquez
 Caquías Torres
 (Fdo.) Juana Velázquez Morales"

(³) En distintas partes de las declaraciones de las partes se describe la situación en la forma expuesta. Por vía de ilustración señalaremos manifestaciones típicas: el demandante Enrique Velázquez dijo, "(La intención desde el principio fue) Que nos dividiríamos herencia del causante, mi padre, entre nosotros tres. Al . . . hacer el documento de reconocimiento donde estaba yo inclusive, la viuda de mi padre se negó. Entonces él . . . tuvo que hacer otro documento y entonces ellas se comprometieron a reconocerme . . ." (T. E., pág. 65); y la demandada Juana Velázquez, al explicar el reconocimiento, expresó que, "Simplemente era mi hermano y no fue reconocido por la viuda, ya que no estuvo de acuerdo con eso, y al ser yo reconocida, como hermana mayor de ellos, entonces voluntariamente por cariño, porque quiero a mi hermano y eso . . ." (T. E., pág. 92).

La demandada Juana Velázquez había adquirido por compra a su padre, efectuada en 1949, un solar en la Calle Molina([4]) que colinda con el de la Calle Vives propiedad del demandante. Este solar *no* formaba parte del caudal hereditario que se dividieron los tres hermanos entre sí. A pesar de que registralmente aparece con una cabida de 555.12 metros cuadrados, una mensura efectuada dentro de un pleito de deslinde entre las mismas partes arrojó una cabida de 540.375 metros cuadrados.

Para el año 1912 el causante Marcos Velázquez tenía establecida una empresa de coches de alquiler en el solar de la Calle Vives. Al comprar el solar de la Calle Molina, los coches entraban por la Calle Vives y salían por la Calle Molina. A los fines de la explotación del referido negocio, se destinó cierta área para un establo y se separó el establo, mediante una cerca, del local destinado al estacionamiento de los coches que formaba parte del solar de la Calle Vives. Esta área es la que precisamente se reclama por el demandante en la presente acción ([5]) como parte de la cabida del solar de la Calle Vives, y que la demandada alega se encuentra dentro del perímetro de su solar de la Calle Molina. En cuanto a este particular el tribunal de instancia dirimió el conflicto de la prueba determinando que "en el solar de 540.375 metros cuadrados de la demandada no se encuentra

---

([4]) El solar de la demandada que había sido adquirido por don Marcos Velázquez en 1914, se describe como sigue:

"URBANA: Solar en la calle de Molina de Ponce, con un área superficial cuadrada, de quinientos cincuenta y cinco metros doce centímetros cuadrados, en colindancia por el norte con Luz María Príncipe, Marcos Velázquez Santiago y *María Laguna;* por el sur con don Marcos Velázquez Santiago y Manuel de Jesús Colón Rosaly; por el este con Marcos Velázquez Santiago y *Juana Arroyo;* y por el oeste con la calle de la Molina."

([5]) La acción se denominó de sentencia declaratoria, pero obviamente su propósito es el de reclamar determinada porción de terreno. La súplica lee: "El demandado . . . solicita una sentencia declaratoria declarando que él es el dueño del trozo de terreno de 88.064 metros cuadrados por habérselo cedido y traspasado la demandada . . . que dicha demandada n℗ es dueña de dicho trozo de terreno . . ."

encerrada parte alguna del solar del demandante". Concluyó además que "al trasmitirse el título del solar descrito en la demanda al demandante, dicho solar se encontraba cercado, y él lo recibió por lo que estaba encerrado dentro de sus colindancias de entonces". ([6])

El Tribunal Superior, Sala de Ponce, declaró sin lugar la demanda. Determinó: (*a*) que la escritura de 1 de marzo de 1951, aunque denominada de compraventa, constituía realmente una donación, y que en su consecuencia el demandante nada podía reclamar; y (*b*) que si se consideraba como compraventa, como el contrato no se hizo a base de un precio por unidad de medida, las vendedoras no estaban obligadas a responder de la deficiencia de cabida, y que en todo caso, la acción estaría prescrita por haber transcurrido más de seis meses desde el otorgamiento de la escritura hasta la iniciación de la acción.

I

Para resolver la controversia planteada, es necesario que determinemos previamente la verdadera naturaleza de la escritura otorgada en 1 de marzo de 1951 por los tres hermanos Velázquez.

La sección 2 de la Ley Núm. 229 de 12 de mayo de 1942 (Leyes, pág. 1297, 31 L.P.R.A. sec. 502) dispone que los hijos nacidos extramaritalmente con anterioridad a la fecha de vigencia de dicha ley([7]) que no tenían la condición de

---

([6]) No hay controversia sobre el hecho de que el solar del demandante "cercado" y "encerrado dentro de sus colindancias de entonces" tiene una cabida de sólo 348.646 metros cuadrados, o sea, una disminución de 88.064 metros cuadrados de la cabida registral. El problema en este caso es que el área combinada de ambos solares según los títulos es de 991.831 metros cuadrados, mientras que la cabida total de ambos como resultado de las mensuras practicadas es de 889.021 metros cuadrados.

([7]) Por no haber obtenido la aprobación de dos terceras partes de los miembros electos para cada cámara, la Ley 229 comenzó a regir a los 90 días de su aprobación, o sea, el 10 de agosto de 1942.

hijos naturales según la legislación anterior, ([8]) podrán ser reconocidos, *a todos los efectos legales*, por acción voluntaria de sus padres, y en defecto de éstos, por la de las personas con derecho a su herencia. Los "efectos legales" a que se refiere la ley son los derechos mencionados en el artículo 127 del Código Civil, ed. 1930 (31 L.P.R.A. sec. 506) : (1) a llevar el apellido del que lo reconoce; (2) a recibir alimentos del mismo; y (3) a percibir la porción hereditaria que determina el código.

En cuanto al derecho a llevar el apellido del padre la sección 2 de la Ley Núm. 229 de 1942, supra, fue enmendada por la Núm. 243 de 12 de mayo de 1945 (Leyes, pág. 815) y se le adicionó una disposición al efecto de que, en ausencia del reconocimiento voluntario a que se hacía referencia en el párrafo primero de dicha sección, los hijos que no tenían la condición de naturales bajo la legislación anterior, se considerarían como tales a los únicos fines de instar acción de filiación para obtener el apellido de sus padres. Tal acción se tramitará de acuerdo con el "procedimiento" que fija el Código Civil para el reconocimiento de hijos naturales. En otras palabras, se autorizó a iniciar una acción de filiación, sin consecuencias patrimoniales, y se le negó acceso a los tribunales cuando el resultado es el de participar en la distribución del caudal relicto al fallecimiento del padre.

Ahora bien, el legislador no vedó totalmente la oportunidad del hijo ilegítimo nacido antes de 1942 para participar en la herencia de su padre, y determinó que podía lograrlo cuando mediara un reconocimiento voluntario del padre, y en defecto de éste, *de las personas con derecho a su herencia*. Esta última clasificación sólo puede incluir aquellos herederos que puedan ser perjudicados con el advenimiento de un heredero adicional, que por incluirse entre las personas con *derecho*

---

([8]) El artículo 125 del Código Civil, ed. 1930 (31 L.P.R.A. sec. 504) disponía que "Son hijos naturales los nacidos fuera de matrimonio, de padres que al tiempo de la concepción de aquéllos hubieran podido casarse, sin dispensa o con ella."

a la herencia, reducirá la porción forzosa o legítima de los otros herederos que le reconocen voluntariamente. Y obviamente, entre estos herederos perjudicados en el presente caso no se encuentra la cónyuge viuda, cuya cuota usufructuaria no podía sufrir mengua alguna por el hecho de que se adicionara un hijo natural como persona con derecho a la herencia, porque cuando tuvo lugar el reconocimiento ya se le había liquidado cualquier participación que le correspondía en los bienes de la herencia, adjudicándosele al efecto una casa y solar en la Calle Vives.

En relación con el reconocimiento por "acción voluntaria" de los padres hemos resuelto desde *Correa* v. *Sucn. Pizá*, 64 D.P.R. 987 (1945) que se requiere un reconocimiento en el acta de nacimiento, en testamento *o en cualquier otro documento público*. *Ramos* v. *Rosario*, 67 D.P.R. 683 (1947); *Eliecer* v. *Sucn. Cautiño*, 70 D.P.R. 432 (1949); *Cortés* v. *Cortés*, 73 D.P.R. 693 (1952). Además, dicho reconocimiento debe haberse hecho con fecha posterior a la vigencia de la Ley Núm. 229. *Fernández* v. *Sucn. Fernández*, 66 D.P.R. 881 (1947); *Rossy* v. *Martínez*, 70 D.P.R. 737 (1949). Claro está, cuando se trata del reconocimiento por acción voluntaria de los herederos, se excluye el reconocimiento en el acta de nacimiento y por testamento. A los fines de este caso, y sin que se pretenda que constituye la norma definitiva sobre el particular, entendemos que el acto de las hermanas Juana y Rosa María Velázquez al otorgar la escritura de compraventa a que se ha hecho referencia, considerado conjuntamente con el documento privado que en la misma fecha suscribieron para aclarar la verdadera naturaleza de dicha escritura, constituye un acto voluntario de reconocimiento del demandante Enrique Velázquez. Como hemos expuesto anteriormente, la concurrencia de la viuda era innecesaria por no afectarse sus derechos hereditarios por el reconocimiento efectuado.

██ Establecidos estos antecedentes es fácil fijar la verdadera naturaleza y el alcance apropiado de la escritura de compraventa, que en realidad, no fue más que una sobre partición y división del caudal hereditario relicto al fallecimiento del padre de las partes otorgantes. No se trata pues de una donación como resolvió el tribunal de instancia, ni tampoco de una compraventa, como lo hicieran aparecer las partes. A nuestro juicio el tribunal a quo incidió en error al considerar que el demandante no tenía derecho a heredar porque no se le había reconocido legalmente, y que por tanto, la transferencia héchale por sus dos hermanas respondía a la mera liberalidad de éstas. Pero este error, como veremos, no da lugar a la revocación.

Se ha discutido por la doctrina si procede el saneamiento cuando se le ha adjudicado a un heredero una finca con determinada cabida y luego resulta con una extensión superficial menor. Sabido es que hecha la partición, los coherederos están recíprocamente obligados al saneamiento de los bienes adjudicados, art. 1022 del Código Civil (31 L.P.R.A. sec. 2902) y que la partición puede rescindirse por causa de lesión en más de la cuarta parte, atendido el valor de las cosas cuando fueron adjudicadas, art. 1027 del Código Civil (31 L.P.R.A. sec. 2912). En cuanto a la obligación de saneamiento en el caso de disminución de cabida, es dudosa su procedencia, ya que el heredero no ha sido realmente privado de derecho alguno por un tercero. Manresa([9]) se manifiesta en la siguiente forma: "Si la finca se valuó a un tanto por unidad de superficie, hay solo un error de valuación que podrá producir la rescisión por lesión en su caso. Si se evaluó en conjunto, no queda ni aun ese recurso, a no haber error en el valor". Aparentemente lo asimila el supuesto de venta por precio alzado o por unidad de medida del contrato de com-

---

([9])Comentarios al Código Civil Español (ed. 1943), Tomo VII, págs. 745–746.

praventa.[10] (Arts. 1358 y 1360 del Código Civil, 31 L.P.R.A. secs. 3818 y 3820.) Beltrán de Heredia [11] se pronuncia así:

"Semejante al anterior, es el caso en que se hace una adjudicación proporcional, pero después resulta que uno de los bienes atribuidos tiene una cabida o extensión superficial menores que las que figuran en la adjudicación.

"Aunque no ha faltado algún autor que haya tratado de incluir estos casos dentro del concepto de evicción, sin embargo, es indudable que falta el requisito indispensable de ésta, cual es la reclamación de un tercero con derecho sobre aquel o aquellos bienes. Se trata, más bien, de un simple error material o de valoración, para cuyo remedio, en ambos casos, bastaría una simple rectificación de la operación particional; o, si es preciso, con el ejercicio de la acción de reglamentación de confines o de deslinde; tal vez podría, incluso, llegarse al ejercicio de la acción reivindicatoria por parte del heredero, cuyo derecho está perfectamente reconocido en la escritura particional y después recibió menos, o de menor valor. Únicamente en la hipótesis de que se le ocasionase una lesión en su haber hereditario que excediese de la cuarta parte tendría derecho a ejercitar la acción de rescisión del artículo 1.073 del Código Civil; pero en ningún caso creo que pueda pensarse en una evicción propiamente dicha, ni en una molestia o perturbación."

Véase además, Laurent, Principios de Derecho Civil Francés (Ed. 1895), Tomo X, págs. 541–542.

De todo lo expuesto se deduce que el demandante a lo sumo podrá ejercitar una acción de rescisión por lesión, pero en tal caso tendría que incluir como demandados a todos los coherederos.[12] En la presente acción el demandante optó

---

[10] Al discutir esta materia bajo el epígrafe de garantía de los lotes, Castán admite esta solución y al efecto indica que "La doctrina científica entiende que son aplicables como supletorias a esta materia las reglas que rigen el saneamiento en la compraventa." Derecho Civil Español, Común y Foral (7ma. ed., 1960), tomo 6⁰, pág. 315.

[11] *El Saneamiento por Evicción en la Participación Hereditaria* (Revista de Derecho Privado, Vol. XXXVIII (1954), pág. 846).

[12] El término prescriptivo para la acción de rescisión de partición por lesión es de cuatro años contados a partir de la fecha en que se efectuó la misma. Artículo 1029 del Código Civil (31 L.P.R.A. sec. 2914).

por dirigirse contra su hermana Juana, y es significativo que no incluyera a su hermana Rosa, especialmente considerando que de ésta derivó título en cuanto al condominio de una mitad que adquirió por compraventa. Presumimos que lo que dicho demandante realmente intentó fue reivindicar el terreno que según su título le falta, pero, como veremos posteriormente, tampoco tuvo éxito en este sentido.

## II

Aunque es innecesario a los fines de resolver este recurso, deseamos añadir que si se considerara la escritura otorgada como una compraventa o como una donación, tampoco procedería dictar sentencia a favor del demandante.

De la escritura otorgada aparece que el condominio de una mitad en el solar que en dicho instrumento se describió con una cabida de 436.711 metros cuadrados, lo adquirió el demandante por el precio alzado de $1,340, sin hacerse referencia a un tanto por unidad de medida. Bajo tales circunstancias, sería de estricta aplicación lo preceptuado en el párrafo primero del art. 1360 del Código Civil (31 L.P.R.A. sec. 3820) al efecto de que "En la venta de un inmueble, hecho por precio alzado y no a razón de un tanto por unidad de medida o número, no tendrá lugar el aumento o disminución del mismo, aunque resulte mayor o menor cabida o número de los expresados en el contrato."(13) Aun cuando se refiere a la división entre los coherederos, es significativo a este respecto el testimonio de la demandada, que no fue contradicho, de que "nos hicimos el reparto de acuerdo a

---

(13) Cuando la venta se realiza por precio alzado el vendedodr viene obligado a entregar y el comprador a recibir todo lo que se comprende dentro de las colindancias del inmueble vendido. *Colón* v. *Batis Olivera*, 34 D.P.R. 648 (1925); *Franceschi* v. *Rodríguez*, 27 D.P.R. 902 (1919); Sentencias del Tribunal Supremo de España de 2 de marzo de 1898, 10 de enero de 1901, 20 de abril de 1902, 9 de mayo de 1914, 2 de julio de 1914 (Revista de Derecho Privado, Vol. I, pág. 492), 1 de diciembre de 1917 (*op. cit.*, Vol. V, pág. 103), 29 de marzo de 1927 (*op. cit.*, Vol. XV, pág. 55). Cf. *Suárez* v. *Suárez*, 47 D.P.R. 97 (1934).

la tasación, al precio de tasación, no se había medido; igual pudo haber salido la de él descompleta, como la mía". (T. E., pág. 100.) Además, hubiese sido necesario incluir también como parte demandada a su hermana Rosa María.

Si se considera la escritura como una donación, es claro que nada podría reclamar el demandante a las donantes, aun cuando el inmueble donado resultare tener menor cabida. El artículo 580 del Código Civil (31 L.P.R.A. sec. 2025) dispone que el donante no queda obligado al saneamiento de las cosas donadas, a menos que la donación sea onerosa, o según Castán, cuando el donante hubiese actuado de mala fe.[14] Bajo las circunstancias concurrentes en el presente caso, la actuación de la demandada y su hermana solamente revela la mejor de las intenciones y el propósito de impedir que consideraciones legales privaran a su hermano el demandante de lo que, a juicio de ellas, claramente le correspondía.

 Finalmente, la demanda presentada tampoco puede tener éxito como acción reivindicatoria, pues el demandante no probó su título sobre la porción reclamada ni la identificó cumplidamente, requisitos indispensables para su ejercicio.[15] Un examen cuidadoso de las certificaciones registrales y las copias certificadas de escrituras presentadas en evidencia demuestra que desde su inscripción original la colindancia Norte del solar del demandante fue un solar de don Abelardo Otero, que luego fue adquirido por el causante

---

[14] Además de la imperfección de la escritura otorgada, cf. *Santiago v. Rodríguez*, 72 D.P.R. 266 (1951), es relevante consignar que no se satisfizo la contribución impuesta por la Ley Núm. 303 de 12 de abril de 1946 (Leyes, pág. 783, 13 L.P.R.A. sec. 881 et seq.). Véase: Scævola, Código Civil (ed. 1943), Vol. XI, pág. 832; Colin y Capitant, Curso Elemental de Derecho Civil (ed. 1927), Vol. VII, pág. 628; Castán, *op. cit.*, tomo 4º, pág. 196.

[15] *Arce v. Díaz*, 77 D.P.R. 624 (1954); *Sucn. Meléndez v. Almodóvar*, 70 D.P.R. 527 (1949); *Sevilla v. Cía. Azucarera del Toa*, 69 D.P.R. 249 (1948); *Marques v. Colón*, 62 D.P.R. 200 (1943); *Gerardino v. Pueblo*, 55 D.P.R. 895 (1940); *Ubarri v. Calaf*, 44 D.P.R. 306 (1932); *Pérez Chanza v. Gerena*, 41 D.P.R. 105 (1930).

Marcos Velázquez, y que no es otro que el solar de la calle Molina, propiedad actualmente de la demandada. Nunca ha figurado como la colindancia Norte un solar de doña María Laguna, hecho este que sería indispensable para que el demandante pudiera prevalecer, ya que la porción que se reclama se extiende hasta la cerca o verja que lo divide del inmueble de la señora Laguna. Es significativo además que en la descripción del solar de la demandada siempre ha figurado el terreno de la señora Laguna como una de sus colindancias por el Norte y que por el Este, se halla consignado como colindante a Juana Arroyo antes, hoy Sucn. de Santiago Cabrera. De tener razón el demandante, el solar de la demandada colindaría por dicho punto cardinal con el solar de la calle Vives únicamente, o sea, con el propio demandante. En cuanto a la identificación de la parcela reclamada, no aparece que haya sido descrita en las alegaciones y la única referencia que se hace es a su cabida de 88.064 metros cuadrados.(16) Aun si se considerara que las alegaciones fueron enmendadas por la prueba presentada, la identificación siempre resultaría insuficiente por la discrepancia existente entre el croquis levantado por el ingeniero Archevald y los testimonios de los testigos del demandante. De conformidad con dicho croquis la parcela de 88.064 metros cuadrados no se extendería hasta la línea misma de colindancia con el solar de doña María Laguna, sino que estaría separada de éste por un callejón de alrededor de 1.50 metros de ancho. Igual situación ocurre en cuanto a la colindancia Este, en relación con el solar de Juana Arroyo. El testimonio de los testigos describió el solar del demandante extendiéndose hasta los referidos solares colindantes.

---

(16) El demandante reclama esta porción a base de una simple operación aritmética, o sea, restando de la cabida registral (436.711 m/c) el área de la parcela según mensura (348.646 m/c). Llamamos la atención que la disminución de cabida es de 88.065 m/c, y no de 88.064 m/c, según se alega.

*Por las razones expuestas procede confirmar la sentencia dictada por el Tribunal Superior, Sala de Ponce, en 17 de diciembre de 1954.*

El Juez Presidente Sr. Negrón Fernández reitera el criterio expuesto en su opinión disidente en el caso de *Eliezer* v. *Sucn. Cautiño*, 70 D.P.R. 432, en cuanto se refiere a la interpretación del significado de "acto voluntario" bajo las disposiciones de la Ley 229 de 1942.

El Juez Asociado Sr. Hernández Matos no intervino.