# 98 DTA 179

## TRIBUNAL DE CIRCUITO DE APELACIONES
## CIRCUITO REGIONAL I DE SAN JUAN

MORA DEVELOPMENT CORPORATION
Apelante

v.

BANCO POPULAR DE PUERTO RICO,
THE FEDERAL SAVINGS BANK OF PUERTO RICO
Apelados

Núm. KLAN-95-001303

San Juan, Puerto Rico, a 23 de abril de 1998

Panel integrado por su Presidente, Juez Angel F. Rossy García
y los Jueces José M. Aponte Jiménez y Antonio J. Negroni Cintrón

Negroni Cintrón, Juez Ponente

## TEXTO COMPLETO DE LA SENTENCIA

Mora Development Corporation *("Mora")* instó el recurso que nos ocupa para que revisemos la Sentencia que emitiera el 21 de agosto de 1995 el Tribunal de Primera Instancia, Sala Superior de San Juan. Mediante dicho dictamen el foro apelado desestimó la demanda que Mora había instado contra el Banco Popular de Puerto Rico *("Banco Popular")* y el Federal Savings Bank of Puerto Rico *("Federal")*, hoy Banco Santander Federal *("Banco Santander")*, sobre Sentencia Declaratoria y Acción Reivindicatoria para que se determinara si éstos o Mora era el legítimo dueño de ciertos terrenos ubicados en Río Piedras, Puerto Rico, y que alegadamente aparecían inscritos doblemente en el Registro de la Propiedad con números de finca distintos.

Celebrado el correspondiente juicio, el tribunal de instancia determinó, entre otras cosas, que el Banco Popular y el Banco Santander eran los dueños de los terrenos y le ordenó al Registrador de la Propiedad que cancelara la inscripción que aparecía a favor de Mora, al concluir que se trataba de una doble inmatriculación.

Teniendo jurisdicción para considerar el recurso, sometido el alegato de los apelados y después de culminar un largo y contencioso trámite para su perfeccionamiento, el recurso quedó sometido. A base de la extensa evidencia documental y testifical desfilada ante la sala de instancia y recogida en el apéndice conjunto sometido, expondremos primeramente el trasfondo procesal y fáctico pertinente y necesario para ubicar en correcta perspectiva el dictamen que emitimos al adjudicar los méritos del recurso.

## I

### A. TRASFONDO PROCESAL PERTINENTE.

El 14 de julio de 1986 el Federal, hoy el Banco Santander, adquirió la finca número 6513 y el 8 de mayo de 1987 el Banco Popular adquirió la finca número 6886, las que de acuerdo con el Registro de

la Propiedad constituyen segregaciones de la finca número 1449, una finca de mayor cabida que, a su vez, había sido segregada de una finca de Superior cabida, la 6212.

Con posterioridad, el 21 de enero de 1988, Mora adquirió del Scotiabank de Puerto Rico y The Bank of Nova Scotia *("Scotiabank")* tres fincas entre las que se encontraban los remanentes de la finca 6212 y una que aparece inscrita con el número 1326 en el Registro de la Propiedad desde el 16 de diciembre de 1947 y que fue también segregada de la finca número 6212, aunque en la actualidad y como veremos más adelante su cabida extraregistral es menor que la descrita en su primera inscripción.

Aunque inscritas con distintos números en el Registro de la Propiedad y a base de sus descripciones registrales y físicas, las fincas 6513 y 6886 adquiridas por el hoy Banco Santander y por el Banco Popular, respectivamente, parecían estar sustancialmente impuestas sobre la finca 1326 adquirida por Mora, la más antigua de estas tres.

Ante el conflicto surgido, Mora instó el pleito que nos ocupa sobre sentencia declaratoria y acción reivindicatoria para recuperar los inmuebles que consideraba suyos del Banco Popular y Federal, hoy Banco Santander, y para que se le compensara por los daños que alegadamente había sufrido por no haber podido desarrollar la finca Número 1326. Entre otros detalles, aseveró en su demanda que la finca matriz de la que se segregaron las propiedades que adquirieron los bancos demandados (finca 1494) nunca había colindado con la finca número 1326 de su propiedad.

Emplazados, los bancos contestaron conjuntamente la demanda y expusieron que la descripción registral de las fincas que respectivamente habían adquirido coincidían con la descripción registral de la 1326 que Mora había adquirido, pero que las habían poseído desde su adquisición y que habían realizado actos de dominio sobre éstas; que sus fincas habían provenido de la finca matriz de la cual también surgió la finca número 1326; que Mora adquirió esta finca después que el Banco Popular y el hoy Banco Santander habían adquiridos las suyas y que la finca 1449 no concordaba con la localización física que le atribuía Mora. Alegaron que tenían mejor derecho que Mora sobre los terrenos en controversia porque habían adquirido con buena fe e inscrito sus respectivos títulos de propiedad sobre las fincas número 6886 y 6513 en el Registro de la Propiedad, antes de que Mora hubiera otorgado la escritura de compraventa sobre la finca número 1326 y la hubiera inscrito a su nombre. Presentaron además reconvenciones reclamando compensación por los daños y perjuicios que Mora les había causado al provocarles gastos y pérdidas relacionadas con el desarrollo, aprovechamiento, uso y disfrute de las fincas número 6886 y 6513.

En una Réplica presentada el 21 de julio de 1989, Mora compareció en autos y planteo que al igual que indicaban los bancos apelados, **el pleito entre las partes presentaba un caso de doble inmatriculación** y solicitó sentencia sumaria a su favor para que se decretara que Mora era el titular de los terrenos objeto del litigio. Los bancos apelados se opusieron y coincidieron en cuanto a que estaban ante un caso de doble inmatriculación, solicitando que mediante sentencia sumaria a su favor se decretara que, por el contrario, ellos eran los titulares de sus respectivas fincas.

El tribunal de instancia (Nellie Ortiz Torres, J.) emitió sentencia sumaria parcial concluyendo que Mora era el titular y tenía el dominio sobre la finca 1,326 y ordenando que se eliminaran del Registro de la Propiedad las fincas 6886 y 6513. Posteriormente y a solicitud de parte, otro juez (Evaristo Orengo, Jr.) reconsideró dicho dictamen y lo dejó sin efecto mediante resolución del 17 de octubre de 1990. Así las cosas, el descubrimiento de prueba continuó. El 22 de julio de 1993 Mora enmendó su demanda para incluir dos acciones adicionales: Una solicitud para reivindicar 3,100 metros cuadrados que, según alegaba, correspondían a la finca registral número 678 (remanente de la 6212) que le pertenecía a Mora, argumentando que este terreno estaba siendo indebidamente poseído por el hoy Banco Santander a título de dueño como parte de la finca número 6513; y otra reclamando compensación por los daños y perjuicios que los mencionados bancos le habían causado al privarle también de desarrollar la finca 678. Ambos bancos solicitaron la desestimación sumaria de la demanda enmendada alegando esencialmente que el Banco Popular era propietario de la finca número 6886 y que el Banco Santander era propietario de los 3,100 metros cuadrados de la finca número 678 y de la finca número 6513 del Banco Santander. Por su parte, el Banco Santander levantó como defensa afirmativa especial la prescripción adquisitiva ordinaria sobre la acción reivindicatoria de los

3,100 metros cuadrados reclamados por Mora.

Finalizado el descubrimiento de prueba, la sala apelada celebró el juicio en su fondo de la controversia en el que las partes desfilaron extensa prueba documental, testifical y pericial en apoyo de sus respectivas posiciones.

Por la parte demandante declararon el Lcdo. Enrique Córdova Díaz y el Ing. Ernesto Jiménez Montes, como testigos de hecho, y el Lcdo. Antonio Filardi Guzmán, como perito agrimensor. Otros testigos anunciados como de *"refutación"* por Mora no fueron llamados a declarar. Por los demandados declararon, como testigos de hecho, el Ing. Rafael Torrens, el Arq. Carlos Buxó, el Sr. Víctor González Alvarez, el Sr. Guillermo Mena, el Sr. Charles Beck, el Ing. William Ramírez Garratón, el Arq. Alfredo Drouyn, el Ing. Jaime Fullana Olivencia, el Ing. Alfredo Heres González, el Sr. William López Matta, representante del Banco Santander, y el Sr. Milton Balbuena, representante del Banco Popular. El tribunal permitió que tanto Mora como los bancos presentaran el testimonio de peritos jurídicos o legales. Mora al Dr. Rodrigo Bercovitz Rodríguez-Cano y los bancos al Lcdo. Dennis Martínez Colón. Admitió, además, las deposiciones del Sr. Guillermo Mena, del Sr. Santiago Rodríguez Jordán, del Lcdo. José Guillermo Garrido Monge y la deposición videomagnetofónica y escrita del Sr. Felipe Correa.

Así las cosas, el tribunal de instancia dictó sentencia desestimando totalmente las reclamaciones incoadas por Mora, adjudicándole al Banco Popular el derecho de propiedad o pleno dominio sobre la finca número 6886 y al hoy Banco Santander igual derecho sobre la finca número 6513. Estimó que estos ostentaban un título Superior al de Mora sobre los terrenos doblemente inmatriculados. En cuanto a los 3,100 metros cuadrados ubicados en la porción Norte de la finca número 6212 concluyó que el Banco Santander los había adquirido mediante prescripción ordinaria de (10) años. Finalmente ordenó la cancelación en el Registro de la Propiedad de la inscripción de la finca número 1326 a favor de Mora.

Denegada una moción solicitando determinaciones de hechos adicionales y de enmienda a la sentencia, Mora procedió a presentar el recurso apelativo que nos ocupa.

## B. TRASFONDO FACTICO

### 1. ORIGEN E HISTORIAL DE LA FINCA NUMERO 1326.

Mediante la Escritura Número 25 otorgada ante el Notario Público Francisco Acevedo el 14 de mayo de 1938, los titulares de aquel entonces agruparon seis fincas que pasaron a constituir la finca registral número 6206. Esta finca fue inscrita en el folio 83 del tomo 126 del Registro de la Propiedad de Río Piedras a favor de doña Carmen Portell Vda. de Mongil y sus hijos Antonio, Luis, Carmen Amalia y Bernardo Mongil con la siguiente descripción:

*"RUSTICA: Finca radicada en los Barrios Cupey y Monacillos de Río Piedras, compuesta de 410.48 cuerdas, equivalentes a 161 hectáreas, 33 áreas, 69 centiáreas, y 33 céntimos, colindando: por el NORTE, con Manuel Rodríguez Serra, Blás Contreras y Sucesión de Angel Plá y Vilá; por el SUR, José Martínez, Agripina Rosa, Claro Pizarro, Vicenta Pizarro, Francisco García, Providencia Pizarro, y Central Vannina; por el ESTE, con terrenos de Mr. Gray, y una quebrada; y por el OESTE; con la Central Vannina y Emilio Antuñane, separado por el Río Piedras y Esmeraldo Arroyo, separado de una quebrada."* (Exhibit 7 de la parte demandante).

De esta finca se segregó una extensión de terreno de 206.67 cuerdas que fue inscrita como la finca número 6212 en el tomo 108 del tomo 126 del Registro de Río Piedras, Sección Norte, a favor de doña Carmen Portell Vda. de Mongil, con la siguiente descripción:

*"RUSTICA: Parcela de terreno radicada en los Barrios Cupey y Monacillos de Río Piedras, compuesta de 206.67 cuerdas, equivalentes a 81 hectáreas, 23 áreas, 18 centiáreas, colindando: por el NORTE, con el camino Cupey, Sucesión Plá y Central Vannina; por el SUR, con una quebrada, terrenos de José Martínez y Esmeraldo Arroyo; por el ESTE, Sucesión Plá, camino municipal de Cupey Alto, José Martínez y una quebrada; y por el OESTE, Central Vannina, Emilio Antuñane y*

*Esmeraldo Arroyo, separados por el Río Piedras."*

El 31 de agosto de 1947 y mediante la Escritura Número 75 otorgada ante el Notario Público Jorge M. Morales, la Sra. Carmen Portell Vda. de Mongil segregó e inscribió a su nombre cinco (5) cuerdas de la finca número 6212 que fueron inscritas con el número 7857 (hoy finca número 1326) en el folio 211 del tomo 235 del Registro de Río Piedras, Sección Norte, con la siguiente descripción:

*"RUSTICA: Parcela de terreno radicada en el Barrio Cupey de Río Piedras, compuesta de 5.00 cuerdas, equivalentes a una hectárea, 96 áreas, 43 centiáreas y dos miliáreas, en lindes: por el NORTE, con la carretera de Cupey y finca principal de Carmen Portell Viuda de Mongil; por el SUR, con Carmen Portell Viuda de Mongil; por el ESTE, con la carretera de Cupey; y por el OESTE, con la finca principal de Carmen Portell Viuda de Mongil."*

Como se indica en la anterior descripción registral, la finca número 1326 colinda por el Norte y por el Este con la antigua carretera de Cupey, hoy Carretera P.R. 176, y tiene la cabida de cinco (5) cuerdas. De la prueba testifical presentada durante el juicio se desprende que la Sra. Portell Vda. de Mongil le arrendó esa propiedad a la Atlantic Products Co. y que el contrato de arrendamiento fue inscrito en el Registro de la Propiedad.

Posteriormente y mediante la Escritura Número 14 del 5 de abril de 1957 otorgada ante el Notario Público Luis E. García Benítez, según aclarada por las número 1 y 44 del 2 de enero y 14 de julio de 1958 ante el mismo notario e inscrita al folio 214 del tomo 235 del Registro de Río Piedras, Sección Norte, la Sra. Portell Vda. de Mongil le vendió las fincas número 6212 y 1326 a James T. Barnes of Puerto Rico, Inc. por el precio de $815,000.00 y $35,000.00, respectivamente. Ambas fincas fueron hipotecadas para garantizar el pago del precio aplazado de la compraventa. James T. Barnes of Puerto Rico, Inc. le vendió a su vez estas fincas a University Heights, Inc. mediante la Escritura Número 68 sobre Compraventa y Constitución de Hipoteca otorgada el 16 de diciembre de 1957 ante el Notario Público Luis E. García Benítez, por el precio de $1,721,000.00 y $50,000.00, respectivamente. En esta escritura se hizo constar que el vendedor había recibido un pronto pago en efectivo, que el comprador asumía la hipoteca que gravaba el inmueble y que el balance del precio se pagaría al tenor de un pagaré al portador, sin intereses, a la presentación, garantizado con hipoteca sobre las dos fincas adquiridas.

De la totalidad de la prueba testifical y documental presentada y admitida durante el juicio por el tribunal de instancia, se desprende sin lugar a dudas que, aunque del Registro de la Propiedad no surge que la finca número 1326 haya sufrido segregación alguna, desde el 1959 en adelante, la cabida original de cinco cuerdas que tenía la finca número 1326 fue reduciéndose extraregistralmente y que su silueta fue alterada. Por razones que expondremos más adelante, la finca fue dividida en dos lotes independientes por la construcción de la calle Montgomery que brinda acceso a la Urbanización San Gerardo desde la Carretera 176 de Cupey en dirección de Noreste al Sureste. También se le redujo cierto terreno que fue utilizado para construir parte de las calles Montgomery y Montana, aceras y varias residencias de la Urbanización San Gerardo.

Siendo titular de ella, el 18 de mayo de 1959, University Heights, Inc. segregó de la finca 6212 que había adquirido de la Vda. Portell de Mongil una finca nueva de setenta y nueve cuerdas con siete mil doscientas cincuenta y dos diez milésimas de otra (79,7552) mediante la escritura número 40 que al efecto otorgó en esa fecha ante el Notario José Antonio Luiña y que al inscribirse se le asignó el número 1449. Aunque la escritura no describió el remanente de la finca 6212, a base de la descripción que de la nueva finca se consigna en la escritura y del efecto probatorio combinado de los distintos planos, fotos aéreas y mensuras sometidas por las partes durante el juicio, resulta evidente que la nueva finca 1449 prácticamente dividió en dos la finca 6212 de la que fue segregada. Una parte quedó hacia el Norte y la otra hacia el Sur de la nueva finca 1449.

Según la escritura antes indicada, los linderos de la finca 1449 eran los siguientes: *"... por el NORTE, con terrenos de don Antonio Mongil, de don Bernardo Mongil y de la finca principal de que se segrega; por el SUR, con terrenos de la finca principal de que se segrega, con terrenos de Venancio Martínez y con terrenos de Manuel Ortiz Toro; por el ESTE, con la Carretera Insular Número Ciento Setenta y Seis que conduce a Cupey, terrenos de Bernardo Mongil, Luis Mongil,*

*Manuel Ortiz Toro y Venancio Martínez; y por el OESTE, con el Río Piedras."*

Varios días más tarde y mediante escritura otorgada también ante el Notario José Antonio Luiña el 27 de mayo de 1959, University Heights Inc. le vendió a Amporico Construction Co. *("Amporico"):* (1) la nueva finca número 1449 de 79.7252 cuerdas, (2) el remanente de la finca número 6212, que como antes indicamos había quedado dividida en dos secciones, una al Norte y otra al Sur de la finca número 1449, y (3) la número 1326. Amporico desarrolló la Urbanización San Gerardo para los años 1964 y 1965 y, como antes indicamos, utilizó parte de los terrenos de la finca registral número 1326 para construir unas 14 residencias que fueron inscritas como fincas independientes en el Registro de la Propiedad y segregadas de la finca número 6212 (hoy 678). Repetimos que no se instó trámite alguno en el Registro de la Propiedad para que se reflejara la reducción en cabida de la finca 1326 y las modificaciones que ésta había sufrido. Resulta apropiado señalar en este momento también que, según los planos sometidos por las partes, los 3,100 metros cuadrados que Mora también interesa reivindicar mediante la acción que nos ocupa son un remanente de la porción Norte de la finca 6212 contiguos a la finca 1326 que no fueron desarrolladas por Amporico como parte de la Urbanización San Gerardo. Inferimos de la prueba presentada que esta parcela al igual que las dos secciones de la finca 1326 quedaron aisladas y, en cierto sentido, desoladas, ya que no surge con claridad de la transcripción de la prueba sometida en qué fecha la Atlantic Products Co. abandonó los predios que había arrendado.

En esas circunstancias, Amporico poseyó los remanentes de las fincas 6212, de la 1449 y de la 1326 hasta por lo menos el 9 de enero de 1967, fecha en la que se presentó ante el Tribunal de Distrito, de los Estados Unidos para el Distrito de Puerto Rico una demanda de ejecución de la hipoteca que gravaba las fincas 6212, 1449 y 1326, en el caso Civil Número 6-67 instado por First National City Bank contra University Heights, Inc., Amporico y otros.

Tal y como consignó el tribunal de instancia en su sentencia, ese foro judicial concluyó que durante el período del 6 de febrero de 1959 al 10 de enero de 1967 el First National City Bank le otorgó préstamos a James T. Barnes of Puerto Rico, Inc. y ésta a Amporico para que fueran utilizados en el desarrollo de la Urbanización San Gerardo; que Amporico abandonó el desarrollo de la Urbanización San Gerardo y que a petición del First National City Bank el tribunal de referencia nombró a un síndico para completar la construcción de 23 casas y proteger las propiedades durante la construcción.

Aunque la venta de estas casas produjo una suma que se utilizó para satisfacer parcialmente la deuda hipotecaria, después de ejecutarse la hipoteca que las gravaba, las fincas número 6212, 1449 y 1326 fueron adquiridas en pública subasta por James T. Barnes of Puerto Rico, Inc., corporación que todavía poseía una hipoteca sobre estas fincas.

Así las cosas, en el 1978, Levitt Homes y James T. Barnes of Puerto Rico, Inc. suscribieron un contrato de opción de compra sobre las fincas número 1326, 678 (antes 6212) y las 925 y la 1350. ■ Estas últimas dos no son objeto del pleito. Ya que para esa época todos creían que estaban ubicadas juntas en el área conocida por *"La Montaña"* al Sur de la finca 1449 y que formaban un sólo predio de aproximadamente 80 cuerdas. Sin embargo, Levitt Homes no pudo culminar dicho contrato, debido a que James T. Barnes of Puerto Rico, Inc. se acogió a la protección de la Ley de Quiebras Federal.

A través de dicho procedimiento los Scotiabanks adquirieron mediante venta judicial las fincas registrales número 6212 (hoy 678) y 1326 el 10 de diciembre de 1981, ■ así como la 925, debido a que las hipotecas que las gravaban fueron ejecutadas. En dicha venta judicial, los Scotiabanks se adjudicaron las tres fincas y contrataron al corredor de bienes raíces Guillermo Mena para que gestionara la venta de las mismas. Este ofreció y mostró el terreno baldío conocido por *"La Montaña"* en el área Sur de la de la finca número 1449 como la propiedad de los Scotiabanks que estaba a la venta, ya que los Scotiabanks también entendían que las tres fincas que habían adquirido mediante la venta judicial eran contiguas y estaban ubicadas en el área al Sur de la finca número 1449 conocida como *"La Montaña".*

F & R Construction, Levitt & Sons y Desarrollos Metropolitanos estuvieron interesados en desarrollar estas fincas. También creían que se trataba de una parcela de 82.62 cuerdas integradas por las tres fincas, que éstas eran contiguas y que estaban ubicadas al Sur de la finca 1449. Levitt Homes

nuevamente intentó negociar con los Scotiabanks la compra de las fincas ya que continuaba interesada en las mismas, pero no tuvo éxito pues los Scotiabanks acordaron con una compañía perteneciente al ingeniero Angel Cabán que ésta opcionara la compraventa de las fincas. El ingeniero Cabán no pudo adquirir las fincas y le transfirió la opción a F & R Construction Corp. Levitt Homes trató nuevamente de comprarle las fincas a ésta constructora, sin éxito.

El 17 de junio de 1987, F & R Construction Corp. suscribió un contrato de opción con los Scotiabanks para la compra de las fincas de los Scotiabanks localizadas en la Urbanización San Gerardo por $1,800,000.00. Específicamente, se incluyó en la opción varias parcelas colindantes que estaban inscritas separadamente y se hizo referencia a la escritura de venta judicial de adquisición por los Scotiabanks del 10 de diciembre de 1981. Se especificó también que los derechos adquiridos por F & R Construction Corp. mediante este contrato de opción podrían serle cedidos a la apelante Mora. El Ing. Cleofe Rubí, funcionario de Mora, firmó dicho documento como testigo.

En este contrato de opción se hizo referencia a la propiedad a ser vendida por los Scotiabanks en los siguientes términos:

*"WHEREAS, the Owners are owners of a certain 82.62 'cuerdas' parcel of land located at the San Gerardo Urbanization in Río Piedras, Puerto Rico, recorded at page___ of volume_____ Registry of _____ Property of property number_____ (the 'Property')."*

En la parte inferior se incluyó como nota al calce la siguiente nota: *"Various adjoining parcels separately recorded. See Judicial Sales Deed No. Five of December 10th, 1981."*

Así las cosas y en relación con el interés del Sr. Cleofe Rubí (padre) de obtener las propiedades de referencia, el tribunal de instancia concluyó que el 21 de junio de 1987 el Sr. Cleofe Rubí (padre), Secretario de Mora, visitó la Oficina de Fotogrametría y le pidió al Sr. Felipe Correa Aponte, un empleado de la Oficina de Fotogrametría del Departamento de Transportación y Obras Públicas a quien conocía, que le ayudase a conseguir una foto de unos terrenos que interesaba en el área de Cupey.

El Sr. Correa y el Sr. Rubí buscaron el rollo de negativos de fotos aéreas más antiguo que tuviesen en la Oficina de Fotogrametría y allí examinaron el área de Cupey. El rollo más antiguo era de 1950. El Sr. Rubí (padre) indicó que el terreno que le interesaba estaba al Sur de los Almacenes Sears en la carretera de Cupey. Examinaron esa área hasta que el señor Rubí (padre) identificó el área que él interesaba por los tubos que observó que se encontraban en el área. Localizada el área, el señor Rubí (padre) solicitó al señor Correa que le consiguiera una foto de esa misma área, pero del año más reciente que tuviesen en fotos aéreas. El año más reciente era el 1985. Buscaron en el rollo de 1985 y el señor Rubí (padre) lleno la información de la solicitud de foto aérea identificando el número de rollo, el número de foto, y la fecha de la foto que interesaba. La foto le fue entregada el 24 junio de 1987. En ésta aparece las configuraciones de las fincas número 6886 y 6513 o los remanentes de la 1326.

En adición a lo anterior, el señor Rubí (padre) visitó el Registro de la Propiedad en varias ocasiones y realizó estudios adicionales para tratar de ubicar físicamente las tres fincas que Mora interesaba comprar. El señor Rubí (padre) se reunió en varias ocasiones con el Lcdo. José A. Garrido Monge con anterioridad al cierre para hablarle sobre los estudios que había realizado. Como se aclarará más tarde, el Ing. Ernesto Jiménez Montes, quien trabajó en la segregación de los remanentes de la finca 1449 adquiridos por Domestic Resources, Inc. *("Domestic")*, también recibió una llamada del Ing. Cleofe Rubí en relación con las fincas en el área de Cupey y sus gestiones con Domestic entre septiembre y diciembre de 1987.

Así las cosas y como también determinó el tribunal apelado, para finales de 1987 el Lcdo. Enrique Córdova Díaz, en representación de los Scotiabanks, y el Lcdo. José Garrido Monge, en representación de Mora, comenzaron las negociaciones para la redacción de la escritura de compraventa de las tres fincas, según la opción acordada entre los Scotiabanks y Mora. El Lcdo. Enrique Córdova Díaz redactó la escritura de compraventa y envió su borrador al licenciado Garrido Monge para su revisión. En abril de 1988, el señor Rubí (padre) volvió a la Oficina de Fotogrametría

y solicitó fotos de la misma área de los años 1950, 1962, 1985 y del 1980.

El licenciado Garrido Monge revisó la escritura de compraventa, le hizo algunas sugerencias y cambios a la misma y la devolvió al licenciado Córdova Díaz para que ésta fuera redactada en forma final. Durante las semanas que tomaron estas negociaciones, el licenciado Córdova Díaz, el licenciado Garrido Monge y los representantes de los Scotiabanks y Mora se reunieron en varias ocasiones para discutir el contenido de la escritura de compraventa y los términos finales de la transacción. Los Scotiabanks ordenaron a Shields Title Insurance Company estudios de título sobre las tres fincas antes de la firma de la escritura de compraventa. Sheilds Title hizo los estudios de título de cada una de las tres fincas y éstos fueron entregados a Mora antes de la firma de la escritura. Dos semanas antes de la firma de la escritura de compraventa, el licenciado Córdova Díaz fue informado por el Ing. Cleofe Rubí, en representación de Mora, que la finca de cinco cuerdas no estaba ubicada en el área de *"La Montaña"* como hasta ese momento habían entendido los Scotiabanks. Según concluyó el tribunal de instancia, luego de una discusión, el licenciado Córdova Díaz le indicó a Mora y a su representante legal que ellos no tenían inconveniente en venderle todo lo que ellos hubiesen adquirido de James T. Barnes of Puerto Rico, Inc. y todo lo que los Scotiabanks tuviesen en el área de Cupey como estaba, pero que sería responsabilidad de Mora localizar las fincas y ver en qué situación estaban las fincas, pues los Scotiabanks no asumían responsabilidad sobre la situación física y la cabida de las fincas. ■

Así las cosas, el 21 enero de 1988 y mediante la Escritura Número 1 otorgada ante el Notario Público Enrique Córdova Díaz, Mora adquirió ■ de los Scotiabanks la finca número 1326 (cinco cuerdas), los remanentes de la finca número 6212 (hoy 678) y la finca número 925 con las siguientes descripciones:

*"(A) RUSTICA: Parcela radicada en los barrios Cupey y Monacillos de Río Piedras, compuesta originalmente de ciento noventa y siete punto sesenta y siete (197.67) cuerdas, hoy noventa y seis punto cuarenta mil cuatrocientos ochenta y nueve (96.40489) cuerdas (equivalentes a hectáreas, áreas, centiáreas, y miliáreas), debido a segregaciones anotadas en el Registro, en lindes: por el Norte, con Camino Cupey, con la Sucesión Plá, Central Vannina, Luis Mongil y Carmen Portell Viuda de Mongil; por el Sur, con una quebrada, con terrenos de José Martínez, con Esmeraldo Arroyo, con Luis Mongil, y con parcela segregada de Carmen Portell Viuda de Mongil; por el Este, con la Sucesión Plá, Carretera Municipal de Cupey Alto, José Martínez, una quebrada, Luis Mongil y parcela segregada de Carmen Portell Viuda de Mongil; y por el Oeste, con Central Vannina, Emilio Antuñane y Esmeraldo Arroyo, separados por el Río Piedras.*

*De la cabida de esta finca ciento siete punto treinta y ocho (107.38) cuerdas, hoy treinta y nueve punto cuarenta (39.40) cuerdas debido a segregaciones anotadas en el Registro, radican en el Barrio Cupey, siendo la descripción la siguiente:*

*RUSTICA: Parcela de terreno radicada en el Barrio Cupey, del término municipal de Río Piedras, con una cabida superficial de ciento siete punto treinta y ocho (107.38) cuerdas, hoy treinta y nueve punto cuarenta (39.40) cuerdas debido a segregaciones anotadas en el Registro (equivalentes a _____ hectáreas, _____ áreas, _____ centiáreas y _____ miliáreas), en lindes, por el Norte, con la Carretera Insular Número Ciento Setenta y Seis (176) y con el Río Piedras; por el Sur, con terrenos de José Martínez y la Sucesión Plá, y con el resto de la parte de esta finca radicada en el Barrio Monacillos; por el Este, con la Carretera Insular Número Ciento Setenta y Seis (176), con terrenos de Antonio Mongil, con terrenos de la Sucesión Plá, y con terrenos de Bernardo Mongil; y por el Oeste, con el Río Piedras y con el resto de la finca ubicada en el Barrio Monacillos."*

*De la cabida de esta finca, 57.00489 cuerdas radican en el Barrio Monacillos, siendo la descripción la siguiente:*

*"RUSTICA: Parcela de terreno en el Barrio Monacillos de Río Piedras, con una cabida superficial de cincuenta y siete punto cero cuatrocientos ochenta y nueve (57.00489) cuerdas (equivalentes a _____ hectáreas, _____ áreas, _____ centiáreas y _____ miliáreas), en lindes, por el Norte, con el resto de la finca ubicada en el Barrio Cupey; por el Sur, con una quebrada, con terrenos de José Martínez con Esmeraldo Arroyo, y con parcela segregada de Carmen Portell Viuda de Mongil; por el Este, con terrenos de la Sucesión Plá; y por el Oeste, con Emilio Antuñane y Esmeraldo Arroyo,*

*separados por el Río Piedras.*

*Inscrita al folio 88 del tomo 51 de Río Piedras Sur, finca número 678, Registro de la Propiedad, Sección Segunda de San Juan. Según certificación del Registrador de la Propiedad de San Juan, Sección Quinta, expedida el 31 de diciembre de 1982, conforme al Art. 7 de la ley, la porción de esta finca que estaba inscrita en dicha Sección Quinta bajo el número 1,350 correspondiente a los barrios Monacillos Este y El Cinco, se cerró y se continuó su historial registral en el Registro de la Propiedad de San Juan, Sección Segunda, bajo el número 678.*

*Se dice que esta finca está sujeta a embargos, anotaciones que están caducados y ya se ha solicitado su cancelación.*

*(B) RUSTICA: Parcela de terreno radicada en el Barrio Cupey de Río Piedras, compuesta de 5.00 cuerdas, equivalentes a una hectárea, 16 áreas, 43 centiáreas y dos miliáreas, colindando, por el Norte, con la carretera de Cupey y finca principal de Carmen Portell Viuda de Mongil; por el Sur, con Carmen Portell Viuda de Mongil; por el Este, con la carretera de Cupey; y por el Oeste, con la finca principal de Carmen Portell Viuda de Mongil. Contiene un edificio dedicado a establo.*

*Inscrita al folio 83 vuelto del tomo 253 de Río Piedras Sur, **finca número 1326,** Registro de la Propiedad de San Juan, Sección Segunda.*

*(C) RUSTICA: Radicada en el Barrio Cupey del término municipal de Río Piedras, hoy Gobierno de la Capital, compuesta de 11.89 cuerdas, equivalentes a cuatro hectáreas, 35 áreas, 85 centiáreas y nueve miliáreas, colindando: por el Norte, con la Urbanización San Gerardo; por el Sur, con la Quebrada Mongil, con el Dr. Francisco Seín, y con la parcela segregada y vendida a Don José Luis Lugo; por el Este, con la Urbanización San Gerardo; y por el Oeste, con la Quebrada Mongil, y terrenos del Dr. Francisco Seín.*

*Inscrita al folio 114 vuelto del tomo 53 de Río Piedras Sur, **finca número 925** (antes 8,031), Sección Segunda de San Juan del Registro de la Propiedad."* (Enfasis nuestro)

El Registrador de la Propiedad inicialmente denegó la inscripción de la Escritura Número 1 del 21 de enero de 1988 ante el Notario Público Enrique Córdova Díaz porque la escritura estaba incorrecta al describir el remanente de la finca 678 (antes 6212) en el Registro de la Propiedad. Debido a ello fue necesario que se otorgara un Acta Aclaratoria para corregir la descripción y la cabida de la finca, la Escritura Número 33 otorgada el 28 de octubre de 1988 ante la Notario Público Diana Méndez Ondina. ■

En la escritura de compraventa de las fincas número 6212 (hoy 678) (A), 1326(B) y 925(C) otorgada por Mora el 21 de enero de 1988, se consignó lo siguiente:

*"CINCO: **La compradora reconoce que cualquiera de ellas pueden tener una cabida real menor a las cabidas que resultan del Registro, según se desprende del Contrato de Opción antes relacionado y de sus propias investigaciones, y estudios sobre el terreno y la Compradora acepta y acuerda que no tendrá derecho a hacer reclamación alguna a los Vendedores a lo cual expresamente renuncia, por tal disminución de cabida de las Fincas o cualquiera de ellas.** Igualmente los Vendedores renuncian a cualquier derecho o reclamación que pudieran tener contra la Compradora por cualquier exceso de cabida sobre la cabida registral de las Fincas o cualquiera de ellas.*

*SEIS: Los Vendedores se obligan a favor de la Compradora al saneamiento en caso de evicción y las otras obligaciones de un vendedor de bienes inmuebles bajo el Código Civil de Puerto Rico. Sin embargo, **debido a que los Vendedores nunca han ocupado físicamente las Fincas por haberlas adquirido mediante Venta Judicial en ejecución de hipotecas, desconocen la existencia de cualquier vicio oculto que pudieren afectarlas.** Por tal motivo la Compradora renuncia a su derecho de saneamiento por tales vicios ocultos si los hubiere. **La Compradora ha examinado las Fincas sobre el terreno y la acepta en sus condiciones existentes."*** (Enfasis nuestro)

Hasta aquí los hechos pertinentes relacionados con la adquisición por Mora de la finca 1320.

## 2. ORIGEN E HISTORIAL DE LAS FINCAS 6513 y 6886

### a) FINCA 6513.

Como antes indicamos, los hermanos James T. Barnes, Jr. y Christine Kirchner, como fiduciarios del fideicomiso James T. Barnes, Sr., también habían obtenido una sentencia y orden de ejecución de hipoteca en el caso Civil Número 81-0634 llevado por ellos en el Tribunal de Distrito, de los Estados Unidos para el Distrito de Puerto Rico sobre la finca número 1449 de 79 cuerdas, la finca que el 18 de mayo de 1959, University Heights, Inc. había segregado de la finca 6212 que había adquirido de la Vda. Portell de Mongil. Cuando James T. Barnes of Puerto Rico, Inc. se acogió a la protección de la Ley de Quiebras Federal y a través de dicho procedimiento los Scotiabanks adquirieron mediante venta judicial las fincas registrales número 6212 (hoy 6212; y 1326 el 10 de diciembre de 1981), así como la 925, pero no la 1449. Domestic una corporación de la cual James T. Barnes, Jr. y Christine Kirchner eran socios, se adjudicó la finca número 1449 en pública subasta celebrada el 26 de mayo de 1982.

Otorgada la Escritura Número 31 de Venta Judicial el 10 de septiembre de 1982 ante el Notario Público Rafael A. Robles Díaz, la finca 1449 fue inscrita en el Registro de la Propiedad el 30 de noviembre de 1982 a favor de Domestic.

En el 1982, el Sr. Charles Beck, persona que se dedicaba a comprar y vender propiedades, fue informado por un amigo que estaban vendiendo unos terrenos en el área de Cupey identificados en un conjunto de planos preparados por el arquitecto Carlos Buxó en el que se describían varios lotes remanentes en la Urbanización San Gerardo, o lo que es lo mismo, remanentes de la finca 1449. Buscó personalmente los lotes ilustrados en los planos preparados por el arquitecto Buxó y los localizó. Más tarde, comenzó a negociar la posible compraventa de éstos con el corredor de bienes raíces del Estado de Michigan George Leslie quien representaba a James T. Barnes, Jr. y a la Sra. Kirchner.

Luego de varias conversaciones, en diciembre de 1982 el señor Beck viajó a Detroit, Michigan, para negociar la compraventa. Dichas conversaciones culminaron en la otorgación de un contrato el 11 de diciembre de 1982 titulado *"Outline of Agreement for Purchase and Sales of San Gerardo Property"* entre Beck y Domestic en el que acordaron que el primero adquiriría de la segunda esos remanentes por el precio de $140,000, asumiendo el señor Beck el pago de las contribuciones sobre la propiedad que pudiera adeudar la finca. Según los archivos del Departamento de Hacienda la deuda contributiva venía acumulándose desde la década de los cincuenta y sumaba la cantidad de $500,000.00 incluyendo principal, recargos, multas e intereses. Según los récords del Departamento de Hacienda, el contribuyente deudor era Amporico, el anterior dueño de la finca 1449. Para el Sr. Beck el negocio era beneficioso, pues conocía que próximamente se aprobaría una amnistía contributiva así como una ley que limitaría las deudas contributivas sobre la propiedad a la acumulada en los últimos cinco años, en aquellos casos en que una propiedad era adquirida por otra persona que no fuera el deudor.

El Sr. Beck y el Sr. John Lohner, socio del primero, decidieron adquirir las acciones de Domestic en lugar de comprar los terrenos remanentes de la finca número 1449 personalmente, pues estimaron que era más conveniente esta alternativa por razones económicas ya que los únicos activos de Domestic eran los remanentes de la finca 1449 en la Urbanización San Gerardo.

Realizada la compraventa, los señores Beck y Lohner pagaron las contribuciones sobre la propiedad adeudadas acogiéndose a la amnistía contributiva que efectivamente se decretó. Cuando los Sres. Beck y Lohner adquirieron a Domestic, le pidieron al Arq. Carlos Buxó que revisara y actualizara los planos que éste había preparado y en los que había identificado los remanentes de la finca 1449. Posteriormente, el señor Beck le encomendó la segregación de estos remanentes al Ing. Ernesto Jiménez Montes para desarrollarlos y venderlos.

Como consecuencia de ese trámite, el 24 de octubre de 1983 Domestic otorgó la Escritura Número

132 sobre segregación ante el Notario Público Orlin P. Goble de una parcela que se describió de la siguiente forma:

*"URBANA: Parcela de terreno radicada en la Urbanización San Gerardo del Barrio Cupey del término municipal San Juan, con una cabida superficial de 5,378.727 metros cuadrados, denominado Predio B del Bloque Cinco-E (B-5-E) de la referida Urbanización, en lindes por el NORTE, en 38.283 metros, con la Calle Montgomery; por el SUR, en 67.153 metros, con terrenos propiedad de la Corporación de Renovación Urbana y Vivienda de Puerto Rico y en otra distancia de 13.524 metros, con el predio denominado A; por el ESTE, en 65.502 metros, con la Carretera Estatal Número 176; y por el OESTE, en 90.869 metros, con la Calle Nevada; y en 38.62 metros, con el predio denominado A."*

Se indicó en la escritura que dicha parcela era segregación de la finca número 1449, inscrita a favor de Domestic al folio 224 vuelto del tomo 47 de Monacillos Este y El Cinco, inscripción octava. Esta finca pasó a inscribirse al folio 101, tomo 208 de Monacillos Este y el Cinco como la **finca número 6513.** Un poco más de dos años después, el 5 de diciembre de 1985, y mediante la Escritura Número 326 ante el Notario Público Baldomero Collazo Salazar, Domestic le vendió dicha propiedad a los esposos Héctor González Alvarez y Cristina González Clanton por la suma de $245,000.00. La escritura de compraventa se inscribió en el Registro de la Propiedad el 18 de diciembre de 1985.

Así las cosas, alrededor de febrero o marzo de 1986, el Sr. William López Matta, representante del Federal, fue a inspeccionar la finca acompañado del Sr. Severo Ramírez, Gerente de Sucursal de dicha entidad bancaria, y del Sr. Víctor González Alvarez. La propiedad estaba rodeada por la Carretera 176 al Este, por la Calle Montgomery al Norte, por la Calle Cuatro al Oeste y por la Urbanización El Dorado, al Sur.

El Federal encomendó un estudio de título a sus abogados Fournier y Fournier, una tasación de la propiedad al Ing. Rubén Colón y una mensura **antes** de la adquisición de la finca número 6513. La tasación fue realizada el 20 de marzo de 1986 y **antes** de adquirir la finca, el Federal cotejó el Registro de la Propiedad, sin encontrar vicios que pudiesen invalidar su título sobre la finca número 6513. Desconocía además la localización de la finca número 1449 y la existencia de la finca número 1326.

El 14 de julio de 1986, el Federal adquirió la finca número 6513 de sus dueños titulares registrales, Víctor González Alvarez y Cristina González Clanton, por el precio de $618,553.60, mediante la Escritura Número 201 otorgada ante el Notario Público Michel Rachid Piñeiro. El Federal inscribió su título en el Registro de la Propiedad el 21 de julio de 1986.

Después de la adquisición de la finca número 6513, el Federal contrató a la firma de arquitectos Sierra, Cardona y Ferrer para que realizara estudios de zonificación, de suelo y gestionara los permisos para la ubicación de una sucursal del banco en dicha propiedad. Además, contrató los servicios del Arq. Edward Underwood para conseguir los permisos necesarios para la construcción de la sucursal de banco.

Desde la adquisición de la finca número 6513, el Federal ha satisfecho el pago de contribuciones sobre la propiedad a razón de $119 semestrales aproximadamente. El Federal también ha incurrido en gastos en relación a la limpieza y mantenimiento de la propiedad, los cuales sobrepasan los $7,000. Desde el 1986 el Federal posee la finca número 6513, la ha mantenido, limpiado y cercado. También se han satisfecho las contribuciones sobre la propiedad bajo el número de catastro 17-087-071-364-14-000.

### b) FINCA 6886.

Después de Domestic adquirir los terrenos de la finca número 1449 inició una serie de proyectos para desarrollar esos predios. Para ello contrató al Arq. Carlos Buxó. Se hicieron planos para la construcción de casas particulares, un plan de apartamentos tipo *"walk-up"*, un condominio y se preparó un estimado de gastos como un plan global para desarrollar los remanentes dentro de la Urbanización San Gerardo. Domestic también realizó gestiones con agencias gubernamentales y sometió un anteproyecto para la aprobación de ARPE, proyecto del cual desistió posteriormente,

aunque vendió otros solares y propiedades.

Posteriormente contrató al Ing. Ernesto Jiménez Montes para segregar el resto de los solares y venderlos, incluyendo los predios más grandes. Como consecuencia de ello, la ARPE aprobó la segregación de la parcela ubicada al Norte de la Calle Montgomery, la finca identificada hoy como 6886. Esta parcela le fue concedida mediante opción al Sr. Nicolás Rivera por 90 días. Al día siguiente de firmar la opción, éste construyó una caseta de madera en el solar y comenzó a ofrecer solares a la venta a otras personas como si fuese el dueño de éstos, recibiendo dinero de los interesados. Transcurridos los 90 días de la opción, el señor Rivera no adquirió la parcela de Domestic y se apropió del dinero adelantado por los interesados.

Como consecuencia de ello, los ciudadanos que habían optado por adquirir solares demandaron al Sr. Nicolás Rivera, a Domestic, al señor Beck, al señor Lohner y posteriormente al Banco Popular. Eventualmente todos los demandados, excepto el Sr. Nicolás Rivera, fueron exonerados de responsabilidad. Como parte de la solución del pleito, Domestic le vendió a los optantes algunos de los solares por el mismo precio que estos habían acordado originalmente con el señor Rivera. Con el propósito de separar la finca que eventualmente se identificaría como la 6886 del litigio y poder disponer de ella en lo que el litigio se resolvía, Domestic decidió segregarla.

El 11 de septiembre de 1986 Domestic otorgó la Escritura Número 82 ante el Notario Público Orlin P. Goble, y segregó de la finca número 1449 una parcela de 8,830.778 metros cuadrados (2.247 cuerdas), de acuerdo con el plano aprobado por ARPE y que había sido presentado en el Registro de la Propiedad, y por $363,000.00 se la vendió a North American Construction Corp., una empresa que se utilizó como intermediario para proteger el solar de los efectos del pleito, por recomendación del Lcdo. Orlin P. Goble. En la escritura se describió el solar de la siguiente forma:

*"PARCELA de terreno localizada en la Urbanización San Gerardo, en los Barrios Monacillos Este y El Cinco de Río Piedras, San Juan, Puerto Rico, con un área superficial de Ocho Mil Ochocientos Treinta Punto Setecientos Setenta y Ocho Metros Cuadrados, equivalentes a dos cuerdas con doscientos cuarenta y siete milésimas de otra cuerda: en lindes por el NORTE, en un arco de 3.106 metros y en varias alineaciones totalizando 97.13 metros, con la Antigua Carretera Número 176; por el SUR, en un arco de 17.288 metros y una distancia de 22.770 metros, con la Calle Montgomery, y en un arco de 60.187 metros y 76.072 metros, con la Calle Montana; por el ESTE, en varias alineaciones que totalizan 70.183 metros, con la Carretera Estatal Número 176; y por el OESTE, en 58.386 metros, con la Calle Montana y en dos arcos de 5.496 metros y 23.418 metros, respectivamente, con la Calle Astoria y en dos distancias que totalizan 81.663 metros con la Calle Astoria."*

Antes que esto ocurriera, para el 1986, el Sr. Milton Balbuena era oficial del Banco Popular. Como parte de sus gestiones en el banco, se le encomendó la tarea de conseguir un solar adecuado para localizar un local para ubicar una sucursal del banco fuera del centro operacional del Banco Popular que estaba ubicado en Cupey. Inicialmente el señor Balbuena visitó las áreas circundantes al centro operacional de Cupey e identificó la finca 6513 propiedad del Sr. Víctor González Alvarez. Se comunicó con éste e inició los trámites para adquirir esa finca.

A punto de suscribir un acuerdo de compraventa, el señor González Alvarez le ofreció esta parcela al Federal que, como hemos indicado antes, la adquirió. En vista de esto, el Sr. Milton Balbuena se dio a la tarea de conseguir otra alternativa e identificó la parcela al Norte de la Calle Montgomery, que hoy conocemos como la finca número 6886. Informados que ésta pertenecía a Domestic, el Banco Popular comenzó negociaciones con el señor Beck, para lograr un acuerdo de opción de compra de dicha finca.

Durante las negociaciones, el señor Beck le suministró a los oficiales del Banco Popular un plano del lote, copia de la escritura de compraventa mediante la cual Domestic adquirió la parcela, información contributiva de la propiedad y una resolución de ARPE de marzo de 1985 en la cual ARPE autorizaba la segregación de la parcela de 8,830 metros de la finca 1449. El banco, a su vez, inició las gestiones para obtener permisos del Federal Deposit Insurance Corporation, de la Oficina del Comisionado de Instituciones Financieras y de las agencias correspondientes. Como la parcela

tenía un zonificación de residencial 3, iniciaron las gestiones de cambio de zonificación. Con tal fin, el banco contrató los servicios de Edward Underwood & Assoc.

El 11 de septiembre de 1986, fecha en que también se segregó la finca 6886, se otorgó la Escritura Número 175 ante el Notario Público Luis E. López Correa y mediante la cual North American Construction Corporation le concedió una Opción de Compra al Banco Popular, por el término de seis meses, extensivo a nueve meses, por el precio total de $700,000.00 sobre dicha finca.

El 15 de enero de 1987 se celebró una vista pública y en abril de 1987 el Banco Popular obtuvo el permiso de la Junta de Planificación de Puerto Rico autorizando la zonificación comercial para el 42% del área total de la parcela. El Banco Popular contrató los servicios del Ing. William Ramírez Garratón de la firma EAP Group Practice para que éste preparara un plano de mensura de la finca que iban a adquirir.

El 8 de mayo de 1987 el Banco Popular finalmente adquirió la finca número 6886 con cabida de 8,830.778 metros cuadrados, equivalentes a 2.247 cuerdas, de North American Construction Corporation por el precio total de $700,000.00. Luego de la adquisición de la finca, el Banco Popular continuó los planes de desarrollo de la sucursal. Realizó presentaciones preliminares de los planos a la Autoridad de Carreteras y otras agencias para obtener la aprobación de las mismos; obtuvo los permisos de las agencias reguladoras para la relocalización de la sucursal y completaron el diseño de la sucursal. En cuanto al solar adquirido, pagó $15,500.00 por la instalación de una verja y su limpieza.

El Banco Popular pagó las contribuciones sobre la propiedad en el momento de su adquisición y ha estado satisfaciéndola a razón de $583.69 por semestre desde mayo de 1987 hasta el presente.

### 3. ORIGEN E HISTORIAL DE LOS 3,100 METROS CUADRADOS.

Los 3,100 metros cuadrados que Mora también interesa reivindicar constituyen unos de los remanentes de la finca 6212 de mayor cabida de la cual se segregaron las fincas 1449 y la 1326. De la totalidad de la prueba desfilada se desprende que este remanente colindaba por el Norte con la finca número 1326, por el Este con la Carretera 176 de Río Piedras a Cupey, por el Sur con la finca de Antonio Mongil (hoy urbanización El Dorado) y por el Oeste con la Calle Montana de la Urbanización San Gerardo.

Los Scotiabanks desconocían dónde estaban ubicados estos 3,100 metros cuadrados cuando se adjudicaron en pública subasta celebrada el 24 de noviembre de 1981 tanto la finca número 1326, el remanente de la finca número 6212 como la finca número 925, que no es objeto del pleito. Estos fueron adquiridos por Mora como remanente de la finca número 6212 en unión a las restantes fincas antes indicadas mediante la escritura otorgada el 21 de enero de 1988, pero Mora tampoco conocía su ubicación física, según la prueba presentada.

A base de ésta es que el tribunal de instancia concluyó con corrección que estos 3,100 metros cuadrados fueron incluidos como parte de la finca 6513 que Domestic segregó el 24 de octubre de 1983 y que eventualmente el Federal, hoy Banco Santander, adquirió. Así se desprende de forma preponderante de la propia descripción incluida de dicha finca en la Escritura Número 132 otorgada ante el Notario Orlin P. Goble en esa fecha y de los planos sometidos por las partes.

### 4. CONSIDERACIONES FACTICAS ADICIONALES SEGUN DETERMINADAS POR EL TRIBUNAL DE INSTANCIA Y APOYADAS POR LA PRUEBA

Los Scotiabanks desconocían la localización de la finca número 1326 y del remanente de 3,100 metros cuadrados de la finca número 6212 (hoy 678) contiguos a la finca número 1326. Debido a ello nunca ocuparon la finca 1326 o los 3,100 metros cuadrados. Entendían que todas las fincas adquiridas estaban ubicadas juntas en el área de *"La Montaña"*. Antes de que otorgara la Escritura Número 1 de Compraventa el 21 de enero de 1988 ante el Notario Público Enrique Córdova Díaz, Mora tampoco conocía la ubicación física de éstas, aunque conocía que la finca 1326 de cinco cuerdas no estaba localizada en el area de *"La Montaña"*.

Luego de adquirirla en 1981, los Scotiabanks pagaron contribuciones sobre la propiedad correspondientes a dos fincas con los siguientes números catastrales: el 115-011-005-23-000 por una finca de 197 cuerdas y el 115-000-001-40-901 por una finca de 11 cuerdas. Los Scotiabanks nunca pagaron contribuciones sobre la propiedad por la finca número 1326 de cinco cuerdas o por las propiedades con números catastrales 17-087-071-491-01-000 y 17-087-071-364-14-000 que corresponden a las fincas número 6886 y 6513, respectivamente. Por la descripción y cabida, así como por el número catastral en los mapas de tasación y catastro del Departamento de Hacienda, el número 115-011-005-23-000 corresponde al remanente Sur de la finca número 5212 en el área de Cupey, lo que se conoce como *"La Montaña"* y el número 115-000-001-40-901 corresponde a la finca número 925 de 11 cuerdas también localizada contigua al remanente Sur de la finca número 6212 en el área de la *"La Montaña"*.

Cada una de las fincas 6886 y 6513 tiene su propio número de codificación para propósitos de las contribuciones sobre la propiedad en el Departamento de Hacienda. La finca número 1326 de cinco cuerdas nunca ha tenido número de codificación catastral en los mapas de los tasadores del Gobierno Estatal de Puerto Rico en el Departamento de Hacienda.

Desde el 1987 el Banco Popular posee la finca número 6886, la ha limpiado, mantenido y cercado. También ha estado pagando contribuciones sobre la propiedad bajo el número de catastro 17-087-071-491-01-000. En el 1988, cuando Mora compró la finca número 1326, el Banco Popular ya poseía físicamente la finca número 6886 y el Federal ya poseía físicamente la finca número 6513. Cuando los Bancos demandados adquirieron las fincas número 6886 y 6513, estas dos fincas estaban segregadas, tenían número registral y cada una tenía abierto un folio en el Registro de la Propiedad.

A principios de mayo de 1988, el Ing. Cleofe Rubí se comunicó con el Banco Popular y le indicó que Mora había comprado la parcela del Banco Popular y que el banco la estaba ocupando sin tener derecho a ello. Ello condujo a conversaciones, reuniones, estudios e investigaciones. Finalmente el Banco Popular le cursó una carta al ingeniero Rubí en la que le informó que tenían derecho de propiedad sobre la finca número 6886, lo que condujo, a su vez, al litigio que nos ocupa.

## II

A base del cuadro pertinente antes reseñado y mediante el dictamen apelado, el tribunal de instancia resolvió, en síntesis, que Mora no tenía derecho a reivindicar la finca número 1326 ni los 3,100 metros cuadrados correspondientes a la finca número 678 (antes 6212). La lógica jurídica de dicho foro fue la siguiente:

*"A. Como los Scotiabanks le vendieron a Mora las fincas 1326 y 678 cuya ubicación exacta desconocían y creían que estaban ubicadas en el área conocida como "La Montaña", no ocuparon físicamente y no poseyeron estos inmuebles y, por lo tanto, no entregaron como corresponde estas fincas vendidas. Federal adquirió por prescripción ordinaria de diez (10) años los 3,100 metros cuadrados correspondiente a la finca 678.*

*B. ............*

*C. Mora no identificó las fincas objeto de la reivindicación.*

*D. Se trata de una doble inmatriculación, pero los bancos cualifican como tercero registral y Mora no.*

*E. A base de la equidad, Mora no debe prevalecer pues Mora recobró su inversión al desarrollar la finca 6212 en el área de "La Montaña" y continuará devengando ganancias según la continúe desarrollando. Los bancos, no han derivado ningún beneficio de su compra."*

Inconforme, en su recurso Mora le imputa al tribunal de instancia haber incurrido en los siguientes errores:

*"1. Instancia cometió claro error en la apreciación de la prueba documental al concluir que Mora no identificó o localizó el terreno objeto de la reivindicación.*

*2. Cometió error el tribunal al resolver que no hubo tradición y por tanto Mora no adquirió el dominio del terreno.*

*3. Cometió error el tribunal al concluir la supuesta "buena fe" de los bancos y al concluir que hubo "doble inmatriculación".*

*4. Erró el tribunal al decretar que se cumplió con el término de prescripción adquisitiva respecto a 3,100 M.C. pertenecientes a la finca 678.*

*5. Erró instancia al recurrir a la figura de la "equidad" para justificar una adjudicación a favor de los bancos apelados."*

Como puede apreciarse, Mora cuestiona la corrección de los fundamentos legales en que el foro apelado basó su dictamen. Ello no obstante y con el fin de facilitar el entendimiento de nuestra razón para decidir, estimamos prudente discutir los errores en un orden distinto al expuesto por Mora.

Debemos comenzar por consignar que el trasfondo fáctico que hemos expuesto en la parte anterior de esta sentencia coincide sustancialmente con las determinaciones de hecho que el tribunal de instancia formuló y están plenamente apoyadas por la prueba presentada. Salvo las excepciones que más adelante expondremos, la apelante no ha demostrado en su recurso que en el proceso para llegar a dichas determinaciones el foro apelado se dejó llevar por la pasión, prejuicio o parcialidad, o que incurrió en un error manifiesto. Ausente esa demostración o circunstancias pertinentes que lo ameriten, no debemos intervenir con la apreciación que de la prueba desfilada hizo el foro de instancia o con las determinaciones de hechos formuladas, las que merecen la deferencia de este foro apelativo. *Mercado Rivera v. Universidad Católica de P.R., supra; Monllor Arzola v. Sociedad Legal de Gananciales, supra; Levy v. Autoridad de Edificios Públicos, supra; Pérez Marrero v. Colegio de Cirujanos Dentistas de Puerto Rico, supra; Pueblo v. Maysonave Rodríguez, supra; Pueblo Int'l., Inc. v. Srio. de Justicia, supra; Sánchez Rodríguez v. López Jiménez, supra; Ex Parte Valencia, supra; La Costa Sampedro v. La Costa Bolívar, supra; Pérez Cruz v. Hosp. La Concepción, supra; Torres Pérez v. Colón García, supra; Morán Simó v. Gracia Cristóbal, supra; Ortiz v. Cruz Pabón. supra.*

Consideremos los señalamientos de error imputados.

A. Al discutir el primer error, Mora postula, en síntesis, que el tribunal se equivocó al concluir que no había localizado las fincas que interesa reivindicar a pesar de que determinó que la finca 1326 estaba sobreimpuesta sobre la 678, (los 3,100 metros cuadrados). Se refiere en parte, a la conclusión de derecho número 31 de la sentencia apelada en la que el tribunal de instancia indica que Mora no precisó si la finca que trata de reivindicar es una de cinco cuerdas con determinada silueta. Pasa a detallar aquella prueba que presentó en el juicio que demuestra lo contrario y a señalar que los bancos apelados no presentaron prueba que desmintiera la suya. Tiene razón, aunque ello no constituye un error que justifique la revocación del dictamen apelado.

Para reivindicar una propiedad inmueble se requiere que el reclamante pruebe la existencia de los siguientes elementos:

*"(a) Que él y no otro es el legítimo dueño de la cosa reclamada, (derecho de dominio);*

*(b) Que la cosa reclamada y no otra es la que le pertenece (identidad de la cosa); y*

*(c) Que esa misma cosa se encuentra indebidamente en poder del demandado, (tenencia o posesión)." Pérez Cruz v. Fernández,* 101 D.P.R. 365 (1973); *Amy et al. v. Amy et al.,* 15 D.P.R. 415, 434 (1909).

El primer requisito es de fácil comprensión. El que reivindica debe ser el propietario o dueño de la cosa y demostrarlo. Cf. *Sucn. Arce v. Sierra,* 70 D.P.R. 841 (1950); *Sosa v. Fidalgo,* 56 D.P.R. 50 (1940); *Gallardo v. Quintana,* 43 D.P.R. 162 (1932); *Gay v. Vega,* 39 D.P.R. 647 (1939); *Amy v. Amy,* 15 D.P.R. 415 (1909); *Banco Territorial y Agrícola v. Arvelo,* 7 D.P.R. 566 (1904).

El segundo, también. En toda acción reivindicatoria, la parte reclamante está obligada a probar la identidad de la cosa que reclama. Se le exige aquella identificación que demuestre que la finca que reclama es la misma a que se refieren los documentos que dicha parte presente en evidencia para acreditar su justo título de dominio. *Pueblo v. Rojas,* 53 D.P.R. 121, 125 (1938). La falta de prueba de identificación suficiente al efecto es por sí sola bastante para confirmar una sentencia que declare sin lugar la acción. *Torres v. Capital de Puerto Rico,* 54 D.P.R. 357 (1939); *Ruiz v. Pacheco,* 8 D.P.R. 443 (1905). En fin, debe fijarse con precisión la situación, cabida y linderos del inmueble a reivindicarse y demostrarse durante el juicio que el predio reclamado es aquel a que se refieren los documentos, títulos y demás medios de prueba en que el actor funde su pretensión. *Arce v. Díaz,* 77 D.P.R. 624, 629 (1954). Véanse además, *Pérez Cruz v. Fernández, supra; Castrillo v. Maldonado,* 95 D.P.R. 885, 891 (1968); *E.L.A. v. Pérez Valdivieso,* 83 D.P.R. 864, 877 (1961); *Velázquez v. Velázquez,* 82 D.P.R. 619 (1961); *Sevilla v. Cía. Azucarera del Toa,* 69 D.P.R. 249 (1948); *Gerardino v. Pueblo,* 55 D.P.R. 895 (1940); *Torres v. Capital de P.R.,* 54 D.P.R. 357 (1939); *Monje v. Osorio,* 42 D.P.R. 146 (1931); *Pérez Chanza v. Gerena,* 41 D.P.R. 105, 107 (1930); *Pesquera v. Fernández et al.,* 22 D.P.R. 53 (1915); *Díaz v. El Pueblo et al.,* 17 D.P.R. 60 (1911); *Sucesión Gorbea v. Pérez,* 10 D.P.R. 460 (1906); *Mourino v. Carreras,* 2 D.P.R. 581, 587-588 (1902).

Finalmente y para que prospere su acción, el reclamante tiene que probar un justo título de dominio.

Como hemos expuesto antes, de la totalidad de la prueba testifical y, principalmente, de la documental presentada durante el juicio se desprende con suma claridad que Mora identificó adecuadamente la finca 1326 y el lote de 3,100 metros cuadrados que intenta reivindicar. Lo que sucede y es evidente es que la cabida y configuración original de la finca 1326 segregada en 1947 de la finca 1449 fue reducida en años posteriores por la construcción de la Urbanización San Gerardo y dividida en dos por la construcción de la Calle Montgomery que brinda acceso a ésta desde la Carretera 176 de Río Piedras a Cupey. Como era de esperarse a la luz de la prueba presentada, estas actuaciones alteraron los contornos extrarregistrales de la finca 1326, redujo su cabida y la dividió en dos predios separados, variaciones que no fueron reflejadas en el Registro de la Propiedad. Debido a esto, la descripción registral de la finca 1326 no corresponde exactamente a la extrarregistral.

Ahora bien, no se requiere mucho esfuerzo para percatarse de toda la prueba documental presentada que, aun con estas diferencias, la finca 1326 y la parcela que corresponde a los 3,100 metros cuadrados son identificables, sin lugar a dudas. Examinada esa prueba es evidente que el examinante puede determinar y apreciar sin dificultad dónde están ubicadas tanto la finca 1326 como los 3,100 metros cuadrados y cuáles son sus respectivos linderos.

En ese sentido, Mora demostró convincente y preponderantemente este requisito. Basta con examinar todos los planos, mensuras y fotografías aéreas sometidas por las partes para determinar de qué finca se trata. Realmente, este asunto no debió constituir controversia alguna entre las partes. La identificación de la finca es evidente.

Concluimos que a los fines de su acción de reivindicación, Mora cumplió con su obligación evidenciaria y sustantiva de identificar cuál era el inmueble que interesaba reivindicar y su ubicación física. *Pérez Cruz v. Fernández Martínez, supra; Almodóvar v. Nolla,* 85 D.P.R. 771 (1962); *Estado Libre Asociado v. Pérez Valdivieso,* 83 D.P.R. 863 (1961); *Velázquez v. Velázquez,* 82 D.P.R. 619 (1961). Considerado el efecto total, racional y justiciero de toda la prueba presentada, el tribunal apelado incurrió en error al resolver lo contrario. Debido a ello esta determinación de hecho, en particular, no merece nuestra deferencia.

Lógicamente y desde la perspectiva del análisis jurídico necesario para adjudicar la controversia, procede entonces que determinemos si, establecida la identidad de la finca 1326 y la parcela de los 3,100 metros cuadrados adquiridas por Mora, por un lado, y las fincas 6513 y 6886 segregadas en 1983 y 1986, respectivamente, de la finca 1449 y adquiridas por los bancos apelados, por otro, constituye una doble inmatriculación de la misma finca. Ello nos obliga a considerar en segundo término el tercer error formulado por Mora.

B. Con respecto a su tercer señalamiento de error, Mora sostiene que es imposible que las fincas

6513 y 6886 segregadas en 1983 y 1986, respectivamente, sea la finca 1326, porque las primeras provienen de la finca 1449, finca que se encuentran a 300 metros de distancia de las 6513 y 6886 y cuyas colindancias impiden que las colindancias de las fincas 6513 y 6886 sean correctas o posibles. Señala además que los bancos no actuaron de buena fe pues no indagaron en el Registro más allá de la descripción de las fincas 6513 y 6886 que aparecían de las inscripciones de sus transferentes y porque el Banco Popular, en particular, utilizó un testaferró para adquirir la propiedad. Finalmente alega que Mora no obró de mala fe como concluyó el tribunal de instancia. Discrepamos.

"Doble inmatriculación" no es otra cosa que el hecho de que una misma finca se encuentre inmatriculada en dos folios independientes uno del otro. Esta inmatriculación puede ser plural si se ha producido más de dos veces. Será doble inmatriculación cuando las dos fincas sean absolutamente idénticas entre sí, aunque sus respectivas descripciones estén hechas de una manera distinta, o cuando una de las fincas coincida sólo parcialmente o se encuentra superpuesta con respecto a otra. *Cruz Fontánez v. Registrador,* 126 D.P.R. 182, 186 (1990).

Constituye un estado patológico o irregular que se produce a veces en el Registro de la Propiedad cuando una misma finca o parte de ella, conste inmatriculada dos o más veces en hojas, folios o registros particulares diferentes dentro de una misma sección del propio Registro. *Cruz Fontántez v. Registrador, supra,* a la pág. 186. La doble inmatriculación acarrea la pérdida de la protección de la Ley Hipotecaria y requiere que se adjudique la controversia a base de las reglas del derecho civil. *Pérez Cruz v. Hernández,* 101 D.P.R. 365, 371-372, n. 6 (1973); *Borrero v. Borrero,* 32 D.P.R. 194 (1923); *Rivera v. The Juncos Central,* 31 D.P.R. 264 (1922); *Ring v. Fernández,* 30 D.P.R. 592 (1922); *Ramos v. Orcasitas,* 14 D.P.R. 68 (1908). ¿Que implica esto? Veamos.

La fe pública registral es la que establece en favor de un adquirente de un titular registral la presunción incontrovertible de que las constancias del registro son ciertas e íntegras, por lo que está protegido de la falta de titularidad en su transferente, o de causas de nulidad, resolución o rescisión que podrían hacer claudicar tal titularidad. Claro está, para ser acreedor a esta protección tan excepcional se exige específicamente que el adquirente cumpla con todos y cada uno de los requisitos para ser tercero registral. Martínez Irizarry, *"El Principio de Fe Pública Registral en Puerto Rico",* 58 Rev. Col. Abog., págs. 719-762 (1962). Pues bien, cuando existe una doble inmatriculación de una finca, resulta evidente que la protección registral indicada tiene que dejarse a un lado, pues la existencia de asientos de igual rango y naturaleza contradictorios e incompatibles entre sí le conferiría a dos adquirentes la misma protección o garantía y ello constituiría un absurdo. De ahí que en el caso de la doble inmatriculación no se extienda la protección del Registro y que para resolver la pugna entre las inscripciones y determinar cuál es la que debe prevalecer, sea necesario acudir a las reglas del Derecho Civil. *Pérez Cruz v. Fernández Martínez, supra.*

La Ley Hipotecaria de 1979 no ofrece la solución cuando surge una controversia producto de la doble inmatriculación de un inmueble, pero el Artículo 251 de dicha ley, 30 L.P.R.A. Sec. 2776, prescribe el recurso procesal a través del cual se puede canalizar el reclamo para que se adjudique la controversia. Este dispone lo siguiente:

*"Si el que tuviera inscrita a su favor una finca creyere que otra inscripción de finca señalada bajo número diferente se refiere al mismo inmueble y al mismo titular, podrá solicitar de la Sala del Tribunal Superior correspondiente que, con citación de todos los interesados y siempre que se pruebe la identidad de ambas fincas como un sólo inmueble, dicte auto resolviendo cuál de ambas inscripciones subsistirá.*

***Cuando la doble inmatriculación se refiera a distintos titulares se resolverá por juicio ordinario sobre la identidad de la finca y el mejor derecho al inmueble.***

*En ambos casos se ordenará la cancelación de la inscripción correspondiente.*

*Cuando el registrador notare que una finca aparece inscrita más de una vez, notificará de tal hecho a los presentantes y a los notarios autorizantes de los títulos inscritos en ambas fincas y pondrá una nota, a los efectos de haber enviado tal aviso, al margen del asiento correspondiente de las fincas. El registrador no procederá a practicar ningún otro asiento hasta tanto no se cumpla con lo*

*dispuesto en esta sección para el caso de la doble inmatriculación."* (Enfasis nuestro.)

Este fue el procedimiento utilizado por Mora, pero considerado todo el trasfondo fáctico antes expuesto, resulta más que evidente que el conflicto entre dicha empresa y los bancos apelados dimanó de la realidad de que sus respectivas fincas constituyen una doble inmatriculación de una misma finca aunque, como antes indicamos, sus descripciones no coinciden totalmente debido a las variaciones que sufriera la finca primeramente inscrita, la 1326, y a que la finca 6513 le anejaron un remanente contiguo de la finca 6212.

Aunque ciertamente resulta difícil entender que las fincas 6513 y 6886 hayan sido segregadas de la finca 1489 cuando ninguna parte de ésta colindaba por el Norte con la antigua Carretera de Río Piedras a Cupey como sucede con la finca 6886, lo determinante para concluir si existe una doble inmatriculación no es el origen de la situación anormal, sino que las fincas doblemente inscritas están total o parcialmente sobreimpuestas una sobre otra.

En el caso que nos ocupa, la finca 6886 está totalmente impuesta sobre la finca 1326. La 6513 está impuesta sobre un poco menos del 25% de la 1326 y sobre el remanente de la finca 6212 de 3,100 metros cuadrados contiguos a la 6513. Es decir la finca 6513 está impuesta sobre dos fincas distintas tal y como lo concluyó el foro apelado.

Ante esta realidad transparente, el tribunal de instancia no erró al concluir que las fincas de las partes estaban doblemente inmatriculadas, tal y como Mora lo aceptó en las etapas iniciales de este extenso litigio, independientemente de lo inexplicable de la segregación que dio origen a las fincas 6513 y 6886. Como consecuencia de ello, ninguna parte puede reclamar la protección del registro como tercero registral. *Pérez Cruz v. Hernández, supra*; *Borrero v. Borrero, supra; Rivera v. The Juncos Central, supra; King v. Fernández, supra; Ramos v. Orcasitas, supra.* En tales circunstancias, procedía que el tribunal de instancia prescindiera de la protección registral y determinara qué parte debía prevalecer de conformidad con los principios de derecho civil aplicables. *Pérez Cruz v. Hernández, supra.*

Ahora bien, contrario a la normativa expuesta y vigente en Puerto Rico, la sala apelada inexplicablemente aplicó los criterios del tercero registral y concluyó que en el caso que nos ocupa los bancos eran terceros registrales y Mora no. Razonó que el tribunal tenía la opción de tratar de descubrir si existía un tercero protegido y si así lo determinaba, decretar que su título prevalecía. Sin embargo, los fundamentos que antes hemos expuestos no le permitían a la sala apelada aplicar esa tesis. Utilizar la protección registral para adjudicar la controversia es totalmente inconsistente con la normativa vigente en Puerto Rico. Aunque ello tampoco constituye un error revocable. En este caso la sala *a quo* se equivocó al así dictaminar.

Como antes señalamos, cuando se produce la doble inmatriculación de una finca los titulares inscritos que reclamen ser dueños no pueden beneficiarse de la protección que ofrece el Registro de la Propiedad. Ello implica necesariamente que ninguno de los reclamantes puede alegar que es tercero registral. La norma en Puerto Rico es que la solución al conflicto de título debe basarse en el derecho civil, con abstracción de la ley y el reglamento hipotecario. *Pérez Cruz v. Hernández, supra; Borrero v. Borrero, supra; Rivera v. The Juncos Central, supra; King v. Fernández, supra; Ramos v. Orcasitas, supra.*

En esas circunstancias, ninguna pertinencia tenía discutir si las actuaciones del Banco Popular y del Banco Santander habían sido de buena o mala fe a los fines de determinar si éstos eran terceros registrales o no, puesto que a ninguna de las partes se les puede beneficiar con la protección del tercero registral para adjudicar cuál tiene el mejor derecho. ■

C. Independientemente de lo antes expuesto, al adjudicar la controversia la sala de instancia también aplicó las reglas del derecho civil que estimaba pertinente. Razonó que, como los Scotiabanks no obtuvieron la posesión y no realizaron actos de dominio sobre la finca registral número 1326 que adquirieron junto a las otras ubicadas en el área de la montaña, no adquirieron el dominio de la finca 1326 porque no las ocuparon físicamente y, por ende, no le transmitieron a Mora la cosa vendida. Como concluyó: (1) los Scotiabanks entendían que las tres fincas que habían adquirido mediante

venta judicial estaban ubicadas juntas en el área Sur de la finca número 6212 conocida como *"La Montaña"*, nunca hubo tradición de los inmuebles vendidos a Mora y que (2) el Banco Santander y el Banco Popular sí adquirieron y poseyeron, respectivamente, las fincas 6513 y 6886. Dictaminó que estas instituciones bancarias tenían mejor título que Mora sobre la finca doblemente inmatriculada.

Mora impugna dicha conclusión mediante su segundo señalamiento de error. Examinado el mismo y a luz de una perspectiva jurídica distinta a la del foro sentenciador, entendemos que el error no fue cometido. Veamos.

De conformidad con lo pertinente dispuesto en el artículo 280 del Código Civil, 31 L.P.R.A. Sec. 111, el derecho de propiedad es *"... el derecho por virtud del cual una cosa pertenece en particular a una persona con exclusión de cualquier otra[,...]concede el derecho de gozar y disponer de las cosas sin más limitaciones que las establecidas en la leyes [y le confiere al propietario] acción contra el tenedor y el poseedor de la cosa para reivindicarla."* Ese derecho puede ser (1) la plena y entera propiedad, o sea, el derecho de usar, disfrutar o enajenar la cosa; (2) el derecho de usarlas o disfrutarlas, o (3) ambas, entre otras. Artículo 281 del Código Civil, 31 L.P.R.A. Sec. 1112. La propiedad de una cosa reside siempre en el que tiene sobre ella el inmediato dominio. Artículo 283 Código Civil, 31 L.P.R.A. Sec. 1114.

Por otro lado, la posesión se adquiere por la ocupación material de la cosa. Artículo 367 Código Civil de Puerto Rico, 31 L.P.R.A. Sec. 1441, y puede ser natural o civil. La natural es la tenencia de la cosa o el disfrute de un derecho por una persona. La civil es la tenencia o disfrute de la cosa, unida a la intención de tener la cosa o derecho como suyo. Artículo 360 Código Civil, 31 L.P.R.A. sec. 1421. El que posee ignorando el vicio que invalide el título o modo de la cosa, es un poseedor de buena fe. Artículo 360 Código Civil, 31 L.P.R.A. Sec. 1424.

La posesión se puede lograr mediante la tradición o traspaso de la posesión del anterior dueño en cuyo caso se denomina adquisición derivativa. Esa adquisición de la posesión como derecho no conlleva el poder efectivo sobre la cosa y constituye un acto que la ley le atribuye consecuencia: La adquisición de la posesión como derecho. Vélez Torres, *Curso de Derecho Civil,* Tomo II, pág. 128, 1983. El efecto principal de esta posesión simple es la adquisición del derecho a reclamar que se respete esa posesión y en caso de que no sea así, se autoriza la intervención judicial para protegerla o restituirla. Artículo 375 Código Civil, 31 L.P.R.A. Sec. 1461.

Ahora bien, la tradición puede ser la entrega de una cosa a otra persona de la posesión del bien determinado, **con la intención de tramitar con dicha posesión el dominio de la que la recibe tiene esa misma intención.** Vélez Torres, *Curso de Derecho Civil.* Tomo II, 1983, pág. 259. En ese caso, la tradición consiste en la entrega de la posesión de la cosa con ánimo del que da y del que la recibe de transmitir y adquirir, respectivamente, el derecho que tenga sobre la cosa. *H.R. Elec., Inc. v. Rodríguez,* 114 D.P.R. 236 (1983). Es un ingrediente necesario en los contratos reales para que pueda considerarse transmitido el dominio de la cosa objeto del negocio jurídico. Vélez Torres, *op. cit.* pág. 260.

El modo, por otro lado, es el acto mediante el cual el transmitente entrega efectivamente la cosa objeto de la relación jurídica y que realiza la enajenación del derecho real, siendo la enajenación el acto por el cual se transfiere a otro la propiedad de alguna cosa a título lucrativo, como la venta, entre otros medios. *García v. Garzot,* 18 D.P.R. 866 (1912).

El artículo 549 del Código Civil, 31 L.P.R.A. Sec. 1931, dispone que *"[l]a propiedad se adquiere por la ocupación[,...] por donación, por sucesión testada e intestada y por consecuencia de ciertos contratos mediante la tradición. Puede también adquirirse por medio de la prescripción."*

La adquisición de la propiedad por contrato exige que concurran los requisitos de título y modo. *Efraín, Ana Rosa, et als. v. Manhattan Bank,* Op. del 29 de abril de 1993, **93 J.T.S. 61**, siendo el *"fundamento o causa jurídica de la adquisición"* y el modo *"la transferencia de la posesión"* del objeto de la adquisición.

En este caso, la tradición se refiere al hecho físico de la entrega de la cosa vendida con ánimo de

transmitir la propiedad. Esta puede ser simultánea y responder al concepto de pago en el sentido amplio, como una *solutio* de una obligación preexistente o asumida de manera coetánea con el acto que ejecuta la tradición. *Id.*

Según el Artículo 1351 del Código Civil, 31 L.P.R.A. Sec. 3811, esta tradición también puede ser real o instrumental. Este artículo dispone lo siguiente:

*"Se entenderá entregada la cosa vendida cuando se ponga en poder y posesión del comprador.*

*Cuando se haga la venta mediante escritura pública, el otorgamiento de ésta equilvaldrá a la cosa objeto del contrato, si de la misma escritura no resultare o se dedujere claramente lo contrario."* (Enfasis nuestro.)

Como puede apreciarse de la citada disposición, en la tradición instrumental el otorgamiento de la escritura equivale a la entrega, pues el consentimiento al contrato conlleva implícitamente la anuencia a que la entrega se realice mediante el otorgamiento de ese instrumento público. Pero ello no es así, cuando de la misma escritura resulta o se deduce claramente que no ha habido entrega de la cosa objeto del negocio. *Efraín, Ana Rosa, et al v. Chase Manhattan Bank, supra.*

A la luz de esta normativa, es que se debe examinar detenidamente la controversia de autos. ■ Como antes hemos indicado, en el 1978 Levitt Homes y James T. Barnes of Puerto Rico, Inc. suscribieron un contrato de opción de compra sobre las fincas número 1326, 678 (antes 6212) y las 925 y la 1350. Estas últimas dos no son objeto del pleito. Al finalizar el contrato éstos actuaron bajo la creencia de que todas las fincas estaban ubicadas juntas en el área conocida por *"La Montaña"* y formaban un sólo predio de aproximadamente 80 cuerdas.

Cuando los Scotiabanks adquirieron mediante venta judicial las mismas fincas el 10 de diciembre de 1981 también entendían que las tres fincas que habían adquirido mediante la venta judicial eran contiguas y estaban ubicadas en el área Sur de la finca número 6212 conocida como *"La Montaña"*. En otras palabras, desconocían la ubicación de la finca 1326 y de los 3,100 metros cuadrados remanentes de la finca 6212 al Norte de la finca 1449.

Tan evidente era el desconocimiento de Scotiabanks y Mora sobre la ubicación de estas propiedades que, según el tribunal de instancia concluyó, el 21 de junio de 1987 el Sr. Cleofe Rubí (padre), Secretario de Mora, visitó la Oficina de Fotogrametría y le pidió al Sr. Felipe Correa Aponte, un empleado de la Oficina de Fotogrametría del Departamento de Transportación y Obras Públicas a quien conocía, que le ayudase a conseguir una foto de los terrenos que interesaba en el área de Cupey; y que también visitó el Registro de la Propiedad en varias ocasiones para realizar estudios adicionales para tratar de ubicar físicamente las tres fincas que Mora interesaba comprar.

Aún así, dos semanas antes de la firma de la escritura de compraventa, el 21 enero de 1988, el Sr. Cleofe Rubí (Padre), en representación de Mora, le informó al licenciado Córdova Díaz, abogado de los Scotiabanks, que la finca de cinco cuerdas no estaba ubicada en el área de *"La Montaña"* como hasta ese momento habían entendido los Scotiabanks, por lo que, según concluyó el tribunal de instancia, luego de una discusión y consciente del problema, el licenciado Córdova Díaz le indicó al representante legal de Mora que los Scotiabanks no tenían inconveniente en continuar con la compraventa, describiendo en el instrumento los bienes objeto de la compraventa como todo lo que los Scotiabanks hubiesen adquirido de James T. Barnes of Puerto Rico, Inc. y que estuviesen ubicados en el área de Cupey como estaba, pero aclarando que sería responsabilidad de Mora localizar fincas y ver en qué situación estaban, pues los Scotiabanks no asumían responsabilidad sobre la ubicación física y la cabida de las fincas.

Como antes indicamos, el 21 enero de 1988 y mediante la Escritura Número 1 otorgada ante el Notario Público Enrique Córdova Díaz, Mora adquirió de los Scotiabanks la finca número 1326 (cinco cuerdas), el remanente de la finca número 6212 (hoy 678) y la finca número 925, desconociendo la ubicación exacta de la 1326 y de los remanentes de la 6212, excepto la porción de ésta ubicada al Sur de la Urbanización San Gerardo. Debido a la incertidumbre sobre la ubicación de las fincas, en la escritura de compraventa se incluyeron las siguientes salvedades:

*"CINCO: La compradora reconoce que las Fincas o cualquiera de ellas pueden tener una cabida real menor a las cabidas que resultan del Registro, según se desprende del Contrato de Opción antes relacionado y de sus propias investigaciones y estudios sobre el terreno, y la Compradora acepta y acuerda que no tendrá derecho a hacer reclamación alguna a los Vendedores a lo cual expresamente renuncia, por tal disminución de cabida de las Fincas o cualquiera de ellas.* Igualmente los Vendedores renuncian a cualquier derecho o reclamación que pudieran tener contra la Compradora por cualquier exceso de cabida sobre la cabida registral de las Fincas o cualquiera de ellas.*

*SEIS: Los Vendedores se obligan a favor de la Compradora al saneamiento en caso de evicción y las otras obligaciones de un vendedor de bienes inmuebles bajo el Código Civil de Puerto Rico. Sin embargo, debido a que los Vendedores nunca han ocupado físicamente las Fincas por haberlas adquirido mediante Venta Judicial en ejecución de hipotecas, desconocen la existencia de cualquier vicio oculto que pudieren afectarlas.* Por tal motivo la Compradora renuncia a su derecho de saneamiento por tales vicios ocultos si los hubiere. **La Compradora ha examinado las Fincas sobre el terreno y la acepta en sus condiciones existentes."** (Énfasis nuestro.)

Como puede apreciarse de todo lo antes expuesto, desde que los Scotiabanks adquirieron las fincas que mediante la escritura en cuestión le vendieron a Mora, desconocían dónde estaban ubicadas la finca 1326 y el remanente de la 6212 al Norte de la finca 1449. Solamente conocían la ubicación del remanente de la 6212 en el área de *"La Montaña",* al Sur de la finca 1449 y de la Urbanización San Gerardo. Tenían la impresión de que todas las fincas estaban ubicadas juntas en *"La Montaña".*

Ello así y a la luz de la normativa expuesta, Mora no adquirió el dominio de la finca 1326 y del remanente de los 3,100 metros cuadrados de la finca 6212 ubicados al Sur de la finca 1326. Art. 549 del Código Civil, *supra.* Toda vez que los Scotiabanks desconocían la ubicación de las fincas indicadas, no las ocuparon o poseyeron en calidad de dueños, no le entregaron la posesión de éstas a Mora y menos aún con el ánimo de transmitir la propiedad. Aunque Mora adquirió título, no se le transfirió la posesión de las fincas 1326 y del remanente de 3,100 metros cuadrados de la 6212, pues no se dio la tradición de éstas. *Efraín, Ana Rosa, et al v. Chase manhattan Bank, supra.*

Ello así, la escritura de compraventa taxativamente disponía que las fincas vendidas nunca habían sido poseídas por los Scotiabanks y no estaban siendo entregadas mediante el otorgamiento de la escritura pública. Debido a ello, no se produjo la entrega de la cosa objeto del contrato, de conformidad con lo dispuesto en el Artículo 1351 del Código Civil, *supra.* Los Scotiabanks nunca poseyeron con intención de transmitir con dicha posesión el dominio de la cosa, a la vez Mora no recibió la cosa con esa intención. La adquisición de la propiedad por contrato exige que concurran los requisitos de título y modo. *Efraín, Ana Rosa, et al v. Chase Manhattan Bank, supra.* En este caso no se dio la tradición o entrega de la cosa vendida con ánimo de transmitir su propiedad.

Sin embargo, lo mismo no puede decirse en cuanto al negocio jurídico de compraventa efectuado por los bancos apelados de las fincas doblemente inscritas. Los titulares de estas fincas las ocuparon, poseyeron y tenían y ejercían su dominio. Al venderle las mismas a los bancos apelados, los titulares enajenaron su derecho dominical y posesión como dueños y se la transmitieron a los bancos apelados, como tal.

Como determinó el tribunal de instancia, cuando en el 1982 el Sr. Charles Beck fue informado por un amigo que se estaban vendiendo unos terrenos en el área de Cupey identificados en un conjunto de planos preparados por el arquitecto Carlos Buxó en el que se identificaban varios lotes remanentes en la Urbanización San Gerardo correspondientes a la finca 1449, fue personalmente a inspeccionarlos según los planos preparados por el arquitecto Buxó, los localizó y los ocupó. Fue entonces que el Sr. Beck comenzó a negociar la posible compraventa de éstos con el corredor de bienes raíces del Estado de Michigan George Leslie, quien representaba a James T. Barnes, Jr. y a la Sra. Kirchner. Como antes indicamos, el Sr. Beck adquirió a Domestic y con ello los remanentes de la finca 1449, de la cual el 24 de octubre de 1983 segregó la parcela que pasó a inscribirse al folio 101, tomo 208 de Monacillos Este y el Cinco como la **finca número 6513.**

La ubicación de esta finca era conocida y debido a ello el 5 de diciembre de 1985 y mediante la

Escritura Número 326 Domestic se la vendió a los esposos Víctor González Alvarez y Cristina González Clanton quienes conocían y habían identificado la finca físicamente, la poseyeron y finalmente se la vendieron al Federal. Este banco las inspeccionó acompañado del Sr. Severo Ramírez, Gerente de Sucursal de dicha entidad bancaria, y del Sr. Víctor González Alvarez. La propiedad estaba rodeada por la Carretera 176 al Este, por la Calle Montgomery al Norte, por la Calle Cuatro al Oeste y por el Sur con la Urbanización El Dorado.

El Federal encomendó un estudio de título, una tasación de la propiedad y además llevó a cabo una mensura **antes** de la adquisición de la finca número 6513. La adquirió y la poseyó como dueño antes de que Mora otorgara la compraventa de la 1326 y desde su adquisición ha satisfecho el pago de contribuciones sobre la propiedad a razón de $119.00 semestrales aproximadamente. Ha limpiado, cercado y mantenido la propiedad.

Por su parte y en relación con la finca 6886 y como también determinara con corrección el foro apelado, después de adquirir los terrenos de la finca número 1449 Domestic solicitó y obtuvo de la ARPE la aprobación de la segregación de la parcela ubicada al Norte de la Calle Montgomery, la finca identificada hoy como 6886, cuya descripción era conocida por Domestic. Poseyó y ocupó esa finca como dueña. El 11 de septiembre de 1986 Domestic otorgó la Escritura Número 82 ante el Notario Público Orlin P. Goble por la cual se segregó la finca 6886 de la finca 1449 y se vendió a North American Construction Corp., la que el 8 de mayo de 1987 se la vendió al Banco Popular.

Desde el 1987 y antes de que Mora otorgara la escritura de compraventa sobre la finca 1326, el Banco Popular posee la finca número 6886, la ha limpiado, mantenido y cercado. También ha estado pagando contribuciones sobre la propiedad bajo el número de catastro 17-087-071-491-01-000.

Resumiendo cuando Mora compró la finca número 1326, en el 1988 ya el Banco Popular y el Federal ocupaban físicamente las fincas número 6886 y 6513, respectivamente. No sólo tenían la posesión y el dominio de éstas, sino que lo hicieron antes que Mora adquiriera la finca 1326; *Efraín, Ana Rosa, et al v. Chase Manhattan Bank, supra.*

Por los fundamentos expuestos, debemos concluir que los bancos apelados tienen mejor título que Mora sobre la finca que adquirieron.

D. Como cuarto señalamiento de error, Mora plantea que el tribunal se equivocó al concluir que el hoy Banco Santander había adquirido mediante prescripción ordinaria de diez (10) años el título sobre el predio de 3,100 metros cuadrados correspondientes a la finca registral número 678 (remanente de la 6212) de su propiedad y que colinda con la finca registral número 1326. Sostiene que asumiendo que cuando Domestic adquirió mediante pública subasta el remanente de la finca 1449 (10 de septiembre de 1982) también obtuvo la posesión de los 3,100 metros cuadrados el término de diez años no ha transcurrido porque fue interrumpido cuando Mora presentó la demanda el 19 de enero de 1989. No tiene razón.

Los artículos 1840, 1841 y 1857 ▇ del Código Civil, 31 L.P.R.A., secciones 5261, 5262 y 5278, respectivamente, establecen los requisitos para la prescripción adquisitiva de los derechos reales. Tanto para consumar la prescripción adquisitiva ordinaria como la extraordinaria, la posesión requerida tiene que ser en concepto de dueño, pública, pacífica y continua. En el caso de la ordinaria se requiere, además, que el reclamante tenga justo título y buena fe. *Rodríguez v. Sucesión Nereo Pizzini,* 89 D.P.R. 506 (1963); *Dávila v. Córdova*, 77 D.P.R. 136, 147 (1954).

El término de diez años aplicable a la adquisición del dominio y demás derechos reales sobre bienes inmuebles lo fija el artículo 1857 del Código Civil, 31 L.P.R.A. Sec. 5278. Al término que haya poseído el reclamante, se le une el término de posesión de sus causantes en derecho. *Quiñones Quiñones v. Quiñones Irizarry,* 91 D.P.R. 225 (1964). El justo título contempla que el poseedor haya adquirido la posesión del bien a través de un negocio jurídico mediante el cual normalmente se traspasa la titularidad. No se toma en consideración si el transmitente es o no en verdad el dueño.

*"Entiéndase por justo título el que legalmente baste para transmitir el dominio o derecho real de cuya prescripción se trate".* Artículo 1852 Código Civil, 31 L.P.R.A. Sec. 5273.

Se presume la buena fe y para rebatirla el opositor debe demostrar que el poseedor conocía vicios en el título. Además, si de la propia escritura de compraventa o del Registro de la Propiedad no surge que el terreno que se posee·se extiende más allá de sus·verdaderos límites y que, por ende, el poseedor no intenta extender el título sobre ese exceso, se posee de buena fe y el título continúa siendo justo. *Cf. Saurí v. Echevarría,* 51 D.P.R. 73, 87-88 (1937).

Un análisis cuidadoso de los hechos antes consignados y respaldados por los apéndices evidenciarios sometidos demuestra que Federal poseyó los 3,100 metros cuadrados que reclama Mora en concepto de ·dueño, pública, pacífica y continua, siendo ·justo título y gozando de buena fe. Domestic se ·adjudicó la finca número 1449 en pública subasta celebrada el 26 de mayo de 1982. Otorgada la Escritura Número 31 de Venta Judicial el 10 de septiembre de 1982 ante el Notario Público Rafael A. Robles Díaz, el título sobre la finca 1449 fue inscrito en el Registro de la Propiedad el 30 de noviembre de 1982 a favor de Domestic.

Al tenor de lo dispuesto en el artículo 1849 del Código Civil, 31 L.P.R.A. Sec. 5270, ■■ el término prescriptivo ordinario comienza a contar, como correctamente indica Mora, en la fecha en que Domestic inscribió su título sobre la·finca número 1449 y la poseyó desde el 30 de noviembre de 1982, pues esta corporación es la antecesora en interés del Federal. Sin embargo, la interposición de la demanda el 19 de enero de 1989 no lo interrumpió, como postula Mora. Es que con su demanda Mora incluyó ciertos documentos en apoyo de su reclamación, pero no fue hasta que el 22 de julio de 1993 que presentó la demanda enmendada que por primera vez incluyó su reclamo de reivindicación de los 3,100 metros cuadrados de referencia. Fue en esa fecha en la que efectivamente le notificó a los bancos apelados su alegado título sobre la parcela indicada. A esta fecha, sí habían transcurrido los diez (10) años requeridos para concretizar el derecho reclamado por el Federal. La presentación de la demanda enmendada podía interrumpir civilmente el término prescriptivo, artículo 1845 del Código Civil, 31 L.P.R.A. Sec. 5266, pero cuando se interpuso, el término prescriptivo de diez (10) años ya había decursado.

Ello así, el error no se cometió y Federal, hoy Banco Santander, advino titular contra tabula de los 3,100 metros cuadrados incorporados en el registro como parte de la finca 3156.

E. Mediante su quinto y ultimo señalamiento de error, Mora cuestiona que la sala apelada haya adjudicado la controversia utilizando, en parte, la equidad. Impugna que el tribunal de instancia haya concluido que Mora había recuperado su inversión, a pesar de que había perdido su derecho sobre la finca 1326 y los 3,100 metros cuadrados remanentes de la finca 6212, porque obtuvo grandes beneficios económicos del remanente de la finca 6212 ubicada en *"La Montaña"* al Sur de la finca 1499.

No estimamos necesario evaluar este señalamiento de error, pues los errores discutidos y adjudicados disponen de la controversia ante nos y la revisión se da contra la sentencia y no sus fundamentos. *Casiano v. Borintex,* Op. del 14 de abril de 1993, **93 J.T.S. 55**; *Zorniak Air Services v. The Cesna Aircraft Co., Res. en 10 de diciembre de 1992,* **92 J.T.S. 167**; *Vocero v. Junta* de *Planificación,* 121 D.P.R. 115, (1988); *Sánchez v. Eastern Airlines,* 114 D.P.R. 691, 695 (1983); *Collado v. E.L.A.,* 98 D.P.R. 111, 114 (1969); *Rodríguez v. Serra,* 90 D.P.R. 776, 777 (1964).

*"La prueba determina el remedio y marca la ruta para el derecho aplicable en la difícil tarea de aproximarnos al ideal de la justicia." Casiano v. Borintex, supra.*

Un análisis cuidadoso de la controversia planteada y litigada durante once largos años nos convencen que la normativa jurídica utilizada .para solucionarla es la discutida y consignada previamente para disponer de los primeros cuatro errores imputados por Mora a la luz de la prueba desfilada.

### III
Por los fundamentos antes expuestos, procede que emitamos sentencia confirmando aquella emitida por la sala apelada el 21 de agosto de 1995.

Lo acuerda el Tribunal y lo certifica la Secretaria General.

Aida Ileana Oquendo Graulau
Secretaria General

**ESCOLIOS 98 DTA 179**

**1.** Los hechos que exponemos en esta parte fueron determinados por el tribunal apelado y encuentran pleno apoyo (1) en la prueba testifical desfilada en el juicio según consignada en los volúmenes del III al IX del apéndice conjunto sometido, los que incluyen una transcripción privada estipulada por las partes de esa prueba; (2) en la prueba documental sometida por las partes en los volúmenes del X al XIV del mismo apéndice y (3) en los planos y demás documentos que se nos remitieron de los autos originales. Ciertamente, el foro sentenciador evaluó dicha prueba y dirimió los conflictos que de ella surgieron. Ello así, no intervendremos con la apreciación que de la prueba desfilada hizo el foro de instancia en ausencia de circunstancias extraordinarias, pasión, prejuicio, parcialidad o error manifiesto y que merecen la deferencia del foro apelativo. *Mercado Rivera v. Universidad Católica,* Op. del 27 de junio de 1997, **97 J.T.S. 106**; *Monllor Arzola v. Sociedad Legal de Gananciales,* Op. de 13 de junio de 1995, **95 J.T.S. 77**; *Levy v. Autoridad de Edificios Públicos,* Op. del 15 de marzo de 1994, **94 J.T.S. 32**; *Pérez Marrero v. Colegio de Cirujanos Dentistas de Puerto Rico,* Res. en 15 de septiembre de 1992, **92 J.T.S. 124**; *Pueblo v. Maysonave Rodríguez*, Op. del 28 de junio de 1991, **91 J.T.S. 67**; *Pueblo Int'l., Inc. v. Srio. de Justicia,* 122 D.P.R. 703 (1988); *Sánchez Rodríguez v. López Jiménez,* 116 D.P.R. 172 (1985); *Ex Parte Valencia,* 116 D.P.R. 909 (1986); *La Costa Sampedro v. La Costa Bolívar,* 112 D.P.R. 9, 19 (1982); *Pérez Cruz v. Hosp. La Concepción*, 115 D.P.R. 721 (1984); *Torres Pérez v. Colón García*, 105 D.P.R. 616, 624 (1977): *Morán Simó v. Gracia Cristóbal,* 106 D.P.R. 155 (1977); *Ortiz v. Cruz Pabón,* 103 D.P.R. 939, 946 (1975). Es doctrina que los foros recurridos están en mejor posición para evaluar la prueba desfilada pues tienen la oportunidad de ver y oír a los testigos declarar y, por tal razón, su apreciación merece gran respeto y deferencia. *Pueblo v. Cabán Torres,* 117 D.P.R. 645 (1986); *Pueblo v. Ríos Alvarez*, 112 D.P.R. 92 (1982). En ausencia de esas circunstancias o de que la apreciación de la evidencia se aleje de la realidad fáctica o la prueba sea inherentemente imposible o increíble, el tribunal apelativo debe abstenerse de intervenir con la apreciación de la evidencia hecha por el foro recurrido. *Pueblo v. Rivera Diodonet,* opinión de 16 de mayo de 1988, 121 D.P.R. 454, (1988); *Pueblo v. De Jesús Rivera,* 113 D.P.R. 817, 826 (1983); *Pueblo v. Turner Goodman,* 110 D.P.R. 734, 738 (1980); *Pueblo v. Luciano Arroyo,* 83 D.P.R. 573, 581-82 (1961).

La apelante no ha presentado fundamentos válidos para demostrar que existían cualquiera de las anteriores circunstancias que ameriten nuestra intervención.

**2.** Este contrato no incluyó la compraventa de la finca 1449.

**3.** El 26 de febrero de 1982, los Scotiabanks inscribieron sus derechos en el Registro de la Propiedad. Las descripciones de las fincas en la escritura de venta judicial son idénticas a las que se consignaron cuando por primera vez se inscribieron en el Registro de la Propiedad. Estas descripciones no contemplaban las segregaciones y cambios físicos sufridos a través de los años por esas fincas.

**4.** Sobre la controversia surgida, el foro apelado consignó en su sentencia que, en la deposición que prestara el 2 de marzo de 1994, el licenciado Garrido Monge expresó lo siguiente:

*"R. O sea, la ubicación física no era prerrogativa mía, era cuestión de agrimensores y de Rubí, etc. Yo, mi preocupación era que fuera inscribible el documento.*

*P. Ujúm.*

*R. Y entonces como no había información en cuanto a la certeza, porque un vendedor te demuestra a tí lo que te está vendiendo, lo que pasa es que ese vendedor no sabía lo que había adquirido.*

*P. Entiendo.*

*R. Es raro que tú te encuentres en un banco que te diga, yo adquirí esto en pública subasta. Lo que yo adquirí*

*es mío, pero yo no sé donde está.*

*P. Y por eso es que entonces Rubí se ve en la necesidad de buscarlo.*

*R. Exacto, porque no proveen planos, porque no los tienen. No tienen información, porque no estuvieron envueltos en el procedimiento de financiamiento, porque su intervención fue como "participant". Y un participante en un préstamo lo que manda es el cheque cuando le piden para que contribuya. El que hizo el servicio de ese préstamo fue James T. Barnes; o sea, usted se encuentra un comprador que no le puede hacer indicaciones de dónde está ubicada, que no tiene planos. Pues entonces, usted como comprador, pues tiene que hacer gestiones para ver dónde es que está ubicada, etc., etc., y hacer averiguaciones, desde el punto de vista mío, registral, desde el punto de vista de Rubí, de la situación física, dónde está ubicado, planos de mensura, etc., etc.*

*P. Y esas las hizo Rubí.*

*R. O sea, él cuando se hizo el cierre, había una cosa esquemática de lo que había. La esquemática era que había un pedazo de terreno que era susceptible de ser desarrollado y de eso había certeza. Y esa fue la pregunta mía. "Con este pedazo, olvídate de lo demás, es bueno el negocio". Dice, "Sí, es fiable [sic] [viable]) el negocio."*

En otra parte el tribunal de instancia consignó la siguiente parte de la deposición:

*"P. ¿Sabe si los Scotiabanks poseían las fincas al momento, antes del otorgamiento?*

*R. O sea, su posesión... entiendo que ellos no tenían posesión física, no la tenían.*

*P. De las fincas.*

*R. O sea, para ellos esto fue una situación, de hecho, de adquirir algo, porque no tenían quien hiciera el "servicing". Scotiabank no estaba en ese momento organizado para dar servicios a préstamos y entonces lo que hacían era participaciones con otras entidades, que fue lo que hicieron.*

*P. Ujúm.*

*R. Al tener problemas James T. Barnes, tienen que adquirir la participación y meterse en "services" de un préstamo.*

*P. Ujúm.*

*R. Pero yo... posesión física, es posesión real, efectiva y acto de dominio, con cerca por todos lados y allí no había ni cerca, ni na'. Ellos realmente sabían una cosa, que habían adquirido algo en pública subasta.*

*P. Ujúm.*

*R. Y Rubí sabía otra cosa, que lo que él estaba comprando era lo que había adquirido Nova Scotia.*

*P. Ujúm.*

*R. O sea, para los efectos de él, todo lo que Nova Scotia adquirió, él compró."*

**5.** Mora adquirió las tres fincas por el precio alzado de $1,800,000.00 desglosados en la siguiente forma: $1,532,000.00 por la finca descrita en la letra *"(A)"*, finca número 6212 (hoy 678); $78,000 por la descrita en la letra *"(B)"*, finca número 1326; y $190,000 por la descrita en la letra *"(C)"*, finca número 925.

**6.** El 21 de enero de 1988 Mora también otorgó la Escritura Número 2 ante el Notario Enrique Córdova Díaz para constituir hipoteca a favor de Scotiabank of Puerto Rico, por la suma principal de $1,350,000, con intereses al 10% anual, vencimiento a la presentación, que grava las tres fincas adquiridas mediante la escritura anterior, distribuyéndose la responsabilidad del principal sobre las tres fincas.

**7.** En lo pertinente, el Artículo 105 de la Ley Hipotecaria, 30 L.P.R.A. Sec. 2357, señala lo siguiente:

*"A pesar que la inscripción no convalida los actos o contratos que sean nulos con arreglo a las leyes, ni altera las relaciones jurídicas de quienes intervengan como partes en dichos actos o contratos, el tercero que de buena fe y a título oneroso adquiera válidamente algún derecho de persona que en el Registro aparezca con facultad para transmitirlo será mantenido en su adquisición, una vez haya inscrito su derecho, cuando por cualquier razón resulte inexacto el Registro, bien sea que se rescinda, resuelva o anule el título del otorgante en virtud de causas que no resulten clara y expresamente del propio Registro, o que existen sobre la finca acciones o títulos de dominio o de otros derechos reales que no estén debidamente inscritos."* (Enfasis nuestro)

La lectura de la citada disposición revela que para que se pueda considerar como tercero registral el sujeto tiene que cumplir con los siguientes requisitos:

*"1. Un tercero civil;*

**2. Con buena fe;**

*3. A título oneroso;*

*4. Mediante un negocio intervivos válido;*

*5. Adquiera un derecho real inmobiliario;*

*6. Inscrito a nombre de persona que en el Registro aparezca con facultades para trasmitirle, en función de un Registro inexacto, sin que consten clara y expresamente las causas de la inexactitud ni concurra alguna de las excepciones a la aplicación de la fe pública registral, y*

*7. que el adquirente, a su vez, inscriba su adquisición". Banco Santander de P.R. v. Daniel Rosario Cirino,* 126 D.P.R. 591 (1990).

**8.** Debe descartarse la aplicación de la regla establecida en el artículo 1362 del Código Civil, 31 L.P.R.A. Sec. 3822, para solucionar una controversia de doble inmatriculación como la que nos ocupa, toda vez que este artículo es de aplicación cuando una propiedad es vendida por **una misma persona** a dos personas distintas. Manresa, *Código Civil Español*, Tomo 10, Vol. I, pág. 270; García Cantero, *Comentarios al Código Civil y Compilaciones Forales*, Revista de Derecho Privado, Tomo XIX, segunda edición, págs. 263-264.

El artículo 1362 similar al artículo 1473 del Código Civil Español dispone lo siguiente:

*"Si una misma cosa se hubiese vendido a diferentes compradores, la propiedad se transferirá a la persona que primero haya tomado posesión de ella con buena fe, si fuere mueble. Si fuere inmueble, la propiedad pertenecerá al adquirente que antes la haya inscrito en el registro. Cuando no haya inscripción, pertenecerá la propiedad a quien de buena fe sea primero en la posesión, y faltando ésta, a quien presente título de fecha más antigua, siempre que haya buena fe."*

**9.** Art. 1840 *"Para la prescripción ordinaria del dominio y demás derechos reales se necesita poseer las cosas con buena fe y justo título por el tiempo determinado en ley."*

Art. 1841 *"La posesión ha de ser en concepto de dueño, pública, pacífica y no interrumpida."*

Art. 1857 *"El dominio y demás derechos reales sobre bienes inmuebles se prescriben por la posesión durante diez años entre presentes y veinte entre ausentes, con buena fe y justo título."*

**10.** *"Contra un título inscrito en el registro de la propiedad no tendrá lugar la prescripción ordinaria del dominio o derechos reales en perjuicio de tercero, sino en virtud de otro título igualmente inscrito, debiendo empezar a correr el tiempo desde la inscripción del segundo."*